Clyde W. **HINDS** and Mary Lee Hinds, Plaintiffs–Appellees,

v.

**GENERAL MOTORS CORPORATION,** Defendant–Appellant.

No. 91–7006.

United States Court of Appeals, Tenth Circuit.

March 16, 1993.

Mary Quinn–Cooper (Bert M. Jones of Rhodes, Hieronymus, Jones, Tucker and Gable, Tulsa, OK, and Michael D. Jones of Kirkland & Ellis, Washington, DC, with her on the briefs) of Rhodes, Hieronymus, Jones, Tucker and Gable, Tulsa, OK, for defendant-appellant.

Anthony M. Laizure (Rick Paynter with him on the brief) of Stipe, Gossett, Stipe, Harper, Estes, McCune & Parks, Tulsa, OK, for plaintiffs-appellees.

Before ANDERSON, BARRETT and TACHA, Circuit Judges.

BARRETT, Senior Circuit Judge.

General Motors Corporation (GM) appeals from a judgment entered in a manufacturer's product liability action following a jury verdict in favor of Clyde W. Hinds, who was severely injured when a pickup driven by one Lloyd Comer crossed over the center line and collided with Clyde's 1983 Buick Le Sabre.

In their complaint, the Hindses alleged that: Clyde suffered serious and permanent personal injuries as a direct and proximate result of the collision, notwithstanding the fact that he was wearing his seat belt; the Buick was defective, unreasonably dangerous, and/or not fit for its intended purpose because its hood had a tendency to buckle and contact the windshield during foreseeable driving occurrences, such as this accident; the Buick contained a defective and inadequate restraint system for the protection of its occupants; and, Clyde suffered painful and permanent injuries as a result of these unreasonably dangerous conditions and as a result of the accident. Clyde sought $3,000,000 in damages for his injuries, medical care and treatment, lost wages, and impairment to earning capacity. Mary sought $500,000 for loss of consortium. GM answered with a general denial, reserving the right to assert affirmative defenses upon the completion of discovery.

The pretrial order summarized the Hindses' allegation that the restraint system in the Buick was "defective and rendered [the] vehicle unreasonably dangerous ...

because it ... incorporate[d] [a] tension relief device which allows excessive slack to develop in the seat belt and impairs the restraint systems [sic] ability to protect occupants from serious injury." (Appellant's Addendum, Vol. I, p. 0007–08). The pretrial order also summarized GM's response that the "restraint system operated properly in the subject accident," "[t]he comfort feature in no way caused or enhanced the Plaintiff's injuries," and the "sole and proximate cause of the Plaintiffs' injuries was the negligence of Lloyd Comer." *Id.* at p. 0009.

The pretrial order contained issues of fact to be resolved at trial, including, "[w]hether the alleged defects in the restraint system of the 1983 Buick Le Sabre *caused or enhanced* the Plaintiff's alleged injuries." (Appellant's Addendum, Vol. I, pp. 0010–11) (emphasis supplied). At trial, the Hindses limited their case to the theory that the Buick's restraint system was defective and unreasonably dangerous and was the *cause* of their injuries. The Hindses developed this theory through the testimony of Mark William Arndt and Dr. Leon Lowery.

Arndt, an expert in accident reconstruction and occupant kinematics, (R., Transcript I, at pp. 45 and 72), testified to the manner in which the accident occurred and the movements of Clyde's body inside the Buick following its collision with Comer's pickup. Arndt testified that the Hindses' vehicle was traveling at forty to forty-three miles per hour and the Comer pickup was traveling at forty-five to forty-seven miles per hour at the time of the impact. *Id.* at p. 52. Arndt concluded, from the injuries sustained by Clyde, that Clyde's upper torso was not restrained in any way by the belt. *Id.* at p. 84. Arndt also concluded that, although a collision of this nature typically causes the rubber-like grommet through which the belt slides to melt when the belt loads up, resulting in a deposit and deformation on the belt, his examination of the belt revealed "nothing consistent with that kind of force or force direction." *Id.* at p. 89.

On cross examination, Arndt testified that: the accident was, in terms of accident severity, in the top one percent of all crashes in the country, *id.* at pp. 99–100; a person would, in an accident of this severity, even with a snug seat belt, "expect to hit some of these structures [windshield, dash, steering wheel]," *id.* at p. 109; and, the lap belt appears to have held. *Id.* at p. 123.

Lowery testified about seat belts for thirty minutes or so without objection. During this time, Lowery testified that although the forces in accidents like this one typically result in markings on the belt and spool-engaging mechanism, he only observed "minimum marks." (R., Transcript I, at pp. 144–46). When Lowery was questioned about the presence of slack in the belt, GM objected on the basis that Lowery had not been qualified as an expert on retractors and that he had no qualifications whatsoever in kinematics or biomechanics. *Id.* at p. 148.

Following GM's objection, the court, after indicating that Lowery had "sufficient expertise ... to give his opinion about these matters," and that GM did not "object up to now and he has been giving his opinion for thirty minutes or so," *id.* at pp. 149–51, allowed Lowery to continue testifying about the Buick's seat belt. Thereafter, Lowery testified that: the seat belt system in the Buick was defective and "as dangerous as can be," *id.* at p. 154; the defect in the belt rendered it unreasonably dangerous to a person like Clyde involved in this type of collision, *id.;* and the shoulder belt did not restrain Clyde's face or upper torso in any way before he reached the windshield. *Id.* at p. 155.

Lowery acknowledged that the Buick owner's manual warned that seat belt slack should be kept to a minimum since excessive slack could reduce the belt's ability to properly restrain in an accident. *Id.* at pp. 157–58. However, Lowery also testified that under the Federal Motor Safety Standards no more than one inch of seat belt webbing is supposed to spool out in a collision of this magnitude before the seat belt retractor locks. Lowery believed that in

this case the belt spooled out to its full extent in violation of the standards, *id.* at pp. 158–59, and that if the seat belt had been equipped with a dual sensitive device, Clyde would not have hit his face on the windshield or dashboard. *Id.* at p. 167.

After the Hindses rested, GM moved for a directed verdict. Although the Hindses had limited their case to the theory that the Buick's restraint system was defective and unreasonably dangerous and the *cause* of their injuries, GM's motion for a directed verdict was predicated upon the Hindses' failure to establish that the Buick's seat belt system had *enhanced* the injuries suffered by Clyde:

> In essence, Your Honor, they have not shown evidence that had the restraint system operated properly, the plaintiff would have received only minor injuries. Because of the restraint system's behavior in this accident, the plaintiff received severe injuries.

> Dr. Lowery testified using the magic words for products liability lawsuits that the seat belt was defective and unreasonably dangerous.... What the plaintiffs failed to present is that somehow the seat belt system enhanced the injury suffered by Mr. Hinds in the accident.

> * * * * * *

> No evidence has been presented thus far, Your Honor, to show that those injuries were in anyway enhanced by the restraint system. Dr. Lowery, the closest he got was to say that slack aggravates the situation. That's a direct quote from Dr. Lowery's testimony. Nowhere did Dr. Lowery state that if the restraint system or seat belt system had operated properly, Mr. Hinds would have received a broken collarbone or a separated shoulder or some minor injury, but because it did not operate properly, he received these severe injuries. He did not offer nor is he qualified ... to offer any testimony concerning enhancement of injuries, or the difference in injuries received with a seat belt that works properly as

opposed to the alleged defects in this seat belt.

(R., Transcript, Vol. II, at pp. 422–24).

Thereafter, the court inquired of Hindses' counsel:

> THE COURT: And you agree that it's an enhancement case.

> MR. LAIZURE: Your Honor, I think the evidence has shown that obviously the seat belt did not cause the first collision, but the defect in the seat belt system is what caused the injuries that we're complaining of in this case. [A]nd that is what I say.

*Id.* at p. 426.

After noting that a directed verdict is proper only when the evidence and the inferences to be drawn therefrom are such that reasonable minds could not differ as to the conclusions to be drawn therefrom, the court denied GM's motion.

GM defended on the basis that the Buick's restraint system functioned properly and that the sole and proximate cause of the Hindses' injuries was the negligence of Lloyd Comer. GM called a number of expert witnesses, including Joseph Rice, an expert in automobile engineering and safety and accident reconstruction, who testified that this was a "very, very severe accident," and in "the top one percent, less than one percent [in terms of severity] of accidents." (R., Transcript, Vol. III, at p. 532). GM also called Robert Lange, an expert in engineering and statistical analysis, who stated that the comfort feature in the GM restraint system gave rise to a much greater usage of seat belts and that the "effectiveness of the seat belt with comfort and without comfort feature is virtually the same." *Id.* at p. 574.

GM presented Murray Mackay, an expert in automotive and mechanical engineering, automotive safety, restraint systems, and biomechanics, (R., Transcript, Vol. III, at p. 619), who testified that at the time of the accident, Clyde was using the belt properly and that there was no "excessive or significant slack in either the shoulder belt or the lap belt." *Id.* at p. 643. He also stated that the comfort feature was a reasonable and safe design, *id.* at p. 682, and that

Clyde could not "have gone through this crash using any belt made anywhere tightly adjusted without hitting his face on the interior portion of the car as it crushed in toward him causing the injuries he sustained." *Id.* at p. 682.

Robert Sinke, Jr., an expert in the design, testing and regulation of seat belt systems, (R., Transcript, Vol. IV, at p. 39), also testified for GM that: the 1983 Buick Le Sabre complied with the Safety Standards of the National Highway Traffic Safety Administration, *id.* at p. 75; the majority of United States car manufacturers have included some form of comfort feature in their belt systems since the middle 1970s, *id.;* and, recent studies indicate that lap/shoulder belt systems, including the design with the comfort feature, are very effective in reducing or preventing fatalities and reducing serious injuries. *Id.* at p. 75.

During cross examination, Sinke testified that he "couldn't produce a name of somebody that [he] felt was more knowledgeable than himself" on seat belts at GM. (R., Transcript, Vol. IV, at p. 111). Sinke acknowledged that too much slack in a shoulder seat belt could cause the head and upper torso to be displaced further in an accident, thereby increasing the likelihood of contact with some interior component of the vehicle such as the dash or windshield. *Id.* at p. 117. Sinke was cross examined, over objection, relative to his knowledge of the Mertz and Brady Memoranda authored by GM personnel who criticized the excessive slack generated by the comfort feature system and stated that the system could "be tricked into being too loose." *Id.* at pp. 124–29.

GM was not allowed to present evidence of Comer's intoxication at the time of the accident. The court also refused to admit the New Car Assessment Program (N–CAP) tests and the GM crash test proffered by GM, finding that the tests were unreliable, more prejudicial than probative, and lacked substantial similarity to the accident in question.

After GM rested, it renewed its motion for a directed verdict. This motion, just as its original motion at the close of the Hindses' case, was predicated solely on the Hindses' failure to establish enhancement under *Lee v. Volkswagen of America, Inc.*, 688 P.2d 1283, 1286 (Okla.1984). (R., Transcript, Vol. III, at p. 721). The court summarily denied GM's renewed motion for "the same reasons" it had denied GM's original motion. *Id.* The court also summarily denied GM's request for an instruction that the Hindses were required to prove enhancement under *Lee v. Volkswagen.* When asked by the court if there were objections to the verdict forms to be submitted to the jury, GM did not object.

The jury returned a verdict in favor of Clyde, awarding him damages of $750,-000.00. The jury returned a verdict in favor of GM on Mary's claims. GM did not object to the verdicts prior to the discharge of the jury.

The district court denied, via minute order, GM's subsequent motion for judgment notwithstanding the verdict which was predicated upon the Hindses' failure to establish enhanced injuries and that GM's breach, negligence, or defective product was the cause of those enhanced injuries. The court also denied, via minute order, GM's motion for a new trial which was predicated upon inconsistent verdicts, the court's failure to instruct on enhancement in accordance with *Lee v. Volkswagen*, the court's refusal to allow GM to prove that Comer's intoxication was the sole cause of Clyde's injuries, and the court's refusal to admit the N–CAP tests and GM's crash test.

On appeal, GM contends that the district court erred in: denying its motion for a directed verdict; not instructing the jury pursuant to *Lee v. Volkswagen;* not granting a new trial after the jury returned inconsistent verdicts; and in certain of its evidentiary rulings.

## I.

GM contends that it was entitled to a directed verdict because the Hindses did not prove enhanced injuries. Specifically, GM argues that: under Oklahoma law set

forth in *Lee v. Volkswagen,* the Hindses were required to prove enhanced injuries; proof of enhanced injuries requires expert testimony; the Hindses presented lay opinions instead of medical or biomechanical testimony on injury enhancement; and since the Hindses presented no competent evidence connecting their injuries to the seat belt, it was entitled to a directed verdict.

The Hindses respond that: GM's appeal is predicated upon its mistaken belief that the Hindses were required to prove enhancement to withstand a motion for a directed verdict; GM was not entitled to a directed verdict because the Hindses met their burden of proof on causation; proof of enhanced injuries was not required in this case; and, there is sufficient evidence in the record to sustain the verdict in the event that they should have been required to show enhancement.

■ We review *de novo* the district court's ruling on a motion for a directed verdict. *Johnson by Johnson v. Thompson,* 971 F.2d 1487, 1495 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 654 (1992). In so doing, we apply the same standard applied by the district court: whether the evidence, viewed in the light most favorable to the nonmoving party, presents a disagreement sufficient to mandate submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Clark v. R.E.L. Products, Inc.,* 972 F.2d 317 (10th Cir.1992). A directed verdict is justified only where the proof is all one way or so overwhelmingly preponderant in favor of the movant so as to permit no other rational conclusion. *Koch v. City of Hutchinson,* 814 F.2d 1489 (10th Cir.1987), *cert. denied,* 488 U.S. 909, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988). In reviewing the district court's ruling, we cannot assess credibility of witnesses or substitute our judgment for that of the jury. *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1251 (10th Cir.1992). Moreover, issues not raised in a motion for directed verdict may not be raised in a subsequent motion for judgment notwithstanding the verdict or considered on appeal. *Id.* (citing

*Farmers Ins. Co. v. Hubbard,* 869 F.2d 565, 570 (10th Cir.1989)). Applying these standards, we hold that the district court did not err in denying GM's motion for a directed verdict.

■ The Hindses proceeded at trial on the theory that the Buick's restraint system was defective and unreasonably dangerous and was the cause of their injuries. Notwithstanding the fact that the Hindses limited their case to one of causation based solely on the defective seat belt, GM nevertheless predicated its motions for a directed verdict on the Hindses' failure to establish enhancement under *Lee v. Volkswagen.* The Hindses, however, were not required to establish enhancement in order to prove causation. The pre-trial order governs the trial and "measures the dimension of the lawsuit, both in the trial court and on appeal." *American Home Assur. Co. v. Cessna Aircraft Co.,* 551 F.2d 804, 806 (10th Cir.1977). Here, the pre-trial order clearly delineated the issues of fact for jury resolution as to whether the Buick's restraint system *caused* or *enhanced* Clyde's injuries. The Hindses did present "a disagreement sufficient to mandate submission to a jury," *Clark v. R.E.L. Products, Inc.,* involving their theory that Clyde's injuries were caused by the defective seat belt. Although a scintilla of evidence is not sufficient to justify submitting a case to the jury, a verdict may not be directed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also White v. Conoco, Inc.,* 710 F.2d 1442 (10th Cir.1983). We hold that the court properly denied GM's motions for a directed verdict.

■ Furthermore, to the degree that GM's appellate allegations of error can be construed a challenge to the Hindses' proof of causation, we decline to consider them since they were not presented to the district court. *Whalen v. Unit Rig, Inc.* If a party fails to raise an issue in the trial court, it is deemed waived on appeal unless plain error is demonstrated. *Steagald v.*

*United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

■ Similarly, to the extent that GM challenges Lowery's qualifications to testify as an expert, we refuse to consider the argument because GM failed to timely raise its objection in the district court. A contemporaneous objection must be made when evidence is offered at trial in order to preserve for appeal the issue of admissibility, for only by timely objection can the trial court avoid error. *McEwen v. City of Norman, Okla.,* 926 F.2d 1539 (10th Cir.1991). And a timely objection must be accompanied with a statement of the specific ground relied upon unless such ground is apparent from the context. *Fortier v. Dona Anna Plaza Partners,* 747 F.2d 1324, 1331 (10th Cir.1984). *See also,* Fed. R.Evid.Rule 103(a)(1), 28 U.S.C.

### II.

GM also asserts that it is entitled to a new trial. It contends that (A) the district court erred in refusing to give an enhancement instruction; (B) the jury rendered inconsistent verdicts; and (C) that the court made evidentiary rulings which violated fundamental fairness. Regarding the evidentiary rulings, GM asserts that the court erroneously excluded from GM's case (a) N–CAP crash tests; (b) a GM crash test; (c) evidence of Lloyd Comer's intoxication; and (d) erroneously admitted the Mertz and Brady Memoranda.

"A motion for new trial is addressed to the sound discretion of the trial court," *Canady v. J.B. Hunt Transport, Inc.,* 970 F.2d 710, 716 (10th Cir.1992), and we will reverse the trial court's decision only if that court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Mayhue v. St. Francis Hosp.,* 969 F.2d 919, 922 (10th Cir.1992) (citations omitted).

### A.

GM contends that the court erred in refusing to instruct the jury regarding enhancement and by instructing instead that "[w]hen an injury or loss is the result of the combined conduct of two or more persons, the conduct of each person is a cause of the injury or loss regardless of the extent to which each contributes to the injury or loss." GM asserts that this instruction was misleading and contrary to law.

■ The substance of jury instructions in diversity cases is a matter of state law, but the question of whether error is harmless is one of federal law. *Adams–Arapahoe Joint School Dist. No. 28–J v. Continental Ins., Co.,* 891 F.2d 772, 778 (10th Cir.1989). A trial court's decisions on instructing the jury are reviewed for an abuse of discretion. *Durtsche v. American Colloid Co.,* 958 F.2d 1007, 1011 (10th Cir.1992). It is error to give an instruction on a theory which does not have sufficient evidence in the record to support its submission to the jury. *United Telecoms., Inc. v. American Television & Comms. Corp.,* 536 F.2d 1310 (10th Cir.1976).

■ This case did not move forward on an enhancement theory. Thus, an enhancement instruction would have been contrary to Oklahoma law and would have misled the jury. A party is entitled to an instruction on its theory of the case only if that theory is supported by competent evidence. *Higgins v. Martin Marietta Corp.,* 752 F.2d 492, 496 (10th Cir.1985). We hold that the trial court properly instructed the jury with respect to the issue of causation.

### B.

■ GM asserts that it is entitled to a new trial because the jury returned inconsistent and irreconcilable verdicts. The jury received four general verdict forms and returned its verdict (1) in favor of Clyde and against GM, awarding damages in the amount of $750,000.00, and (2) in favor of GM and against Mary. In response to the trial court's inquiry as to whether GM desired to make any record prior to the discharge of the jury, counsel for GM failed to raise any objection to the jury's verdicts on the grounds of inconsistency.

■ This court will generally not address issues raised for the first time on

appeal. *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir.1991) (citing *Farmers Ins. Co. v. Hubbard*, 869 F.2d 565, 570 (10th Cir.1989)). This court has held "that a party's failure to object to a verdict on the ground of inconsistency prior to the jury's discharge waives his right to raise the issue in a posttrial motion or on appeal unless the verdict is inconsistent on its face so that entry of judgment upon the verdict is plain error." *Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1424 (10th Cir.), *cert. denied*, 479 U.S. 1007, 107 S.Ct. 647, 93 L.Ed.2d 702 (1986).

■ We hold that the jury verdicts herein do not reflect inconsistencies. The jury was asked to consider damage awards for both Clyde and Mary. Each award was separate and independent of the other, as evidenced by the court's instructions. If Clyde was entitled to recover, the jury was to fix an award which would compensate Clyde for his personal injuries, permanent disability, pain and suffering, medical expenses, and pecuniary losses. Separate and distinct from that award, the jury was to fix a monetary amount for Mary which would compensate her for loss of services, society and the consortium of her husband, should she be so entitled. The verdicts rendered do not evidence inconsistency, and furthermore, Mary is not appealing the jury's refusal to compensate her on the loss of consortium claim. In any event, we hold that by failing to object in a timely fashion to the verdicts, GM waived its right to raise the inconsistency issue on appeal, absent plain error.

## C.

■ GM contends that the trial court made several erroneous evidentiary rulings. If the district court determines that evidence is relevant under Fed.R.Evid. 404(b), it "must then exercise its discretion to determine under Fed.R.Evid. 403 whether such evidence should still be excluded because its probative value is substantially outweighed by its prejudicial effect." *United States v. Harrison*, 942 F.2d 751, 759 (10th Cir.1991) (citations omitted). A trial court's evidentiary rulings will not be disturbed absent an abuse of discretion. *Durtsche v. American Colloid Co.*, 958 F.2d at 1011. "When ruling under Fed. R.Evid. 403, the task of balancing the probative value of evidence against the harm likely to result from its admission is well-suited for the trial judge who is familiar with the full scope of the evidence." *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (10th Cir.1992) (citing *C.A. Assocs. v. Dow Chemical Co.*, 918 F.2d 1485, 1489 (10th Cir.1990)).

### (a)
### *Court's Exclusion of N–CAP Tests*

■ GM listed as potential exhibits in the pretrial order several N–CAP tests conducted by the government, which provide public information on the crash performance of various vehicles. The Hindses neither objected to these tests as listed in the pretrial order nor filed a motion in limine to preclude their introduction into evidence.

GM asserts that the court erred in allowing Arndt and Lowery to rely on and testify about N–CAP tests while excluding the tests from GM's case. While testifying to deceleration as a measure of crash severity and as it relates to, among other things, the projectory of occupants inside of a vehicle, Arndt testified that "the federal government has run several collisions of vehicles similar, substantially similar to the vehicle involved in this" collision. Arndt referenced the government's thirty-mile-an-hour barrier tests while utilizing a graph to compare deceleration levels.

Lowery testified that "all the tests and all the test data" show increased injuries caused by slack in the seat belt. During Lowery's cross-examination, GM introduced two N–CAP tests of cars employing European seat belt systems which Lowery had described during direct examination. Even though the court questioned the reliability of the tests, it allowed the testimony to proceed.

Because the court did not strike Lowery's general assertion as to what other N–CAP tests depict, GM, in its case, sought to

introduce videotapes of specific tests through its expert, Sinke. Sinke indicated that he had viewed N–CAP tests since the program's inception in 1979. He testified that the tests, conducted with no slack in the seat belt system, demonstrate seat belt performance and the response of dummies in serious crashes. The court expressed concern about the reliability of the N–CAP tests and their similarity to the accident in question. The court found no assurance that the seat belts in the N–CAP tests had not been readjusted, notwithstanding the presence of a certificate of authenticity.

Although the videotapes were not admitted into evidence, Sinke was allowed to testify to the N–CAP test results, using charts and graphs for demonstrative purposes. According to GM, the court's ruling presents the incongruous situation where verbal descriptions of the tests are deemed reliable but the tests themselves are not.

 While Arndt and Lowery did mention government N–CAP tests in general, no specific test was referenced. Further, GM's expert was allowed to discuss specific N–CAP test results, though the court did not permit a viewing by the jury of the videotaped tests. The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1099 (10th Cir.1991). We hold that the district court did not abuse its discretion in excluding videotapes of the crash tests as unreliable.

### (b)
### Court's Exclusion of GM Test

 GM conducted its own crash test, the purpose of which was to demonstrate engineering principles concerning the movement of an occupant during an angled impact. GM claimed that the test was not designed to reconstruct the accident. The Hindses filed a motion in limine to exclude this crash test, arguing that GM was attempting to recreate the accident and that the test lacked the requisite similarity to the actual accident. The district court found that the test could have created con-

fusion for the jury and that it was substantially dissimilar to the accident and thus more prejudicial than probative.

Videotaped evidence which is not meant to depict the actual accident may be admitted to show mechanical principles "upon a showing that 'the experiment [was] conducted under conditions that were at least similar to those which existed at the time of the accident.'" *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1442 (citing *Bannister v. Town of Noble, Okla.*, 812 F.2d 1265, 1270 (10th Cir.1987)). "However, if the evidence is offered to merely show physical principles, the experiment should be conducted without suggesting that it simulates actual events." *Id.* at 1442 (citing *Jackson v. Fletcher*, 647 F.2d 1020, 1027 (10th Cir. 1981)).

 The determination as to whether proferred evidence is relevant is a matter committed to the discretion of the trial court and will not be disturbed on appeal, absent a showing of a clear abuse of discretion. *Beacham v. Lee Norse*, 714 F.2d 1010, 1014 (10th Cir.1983); Fed.R.Civ.P. Rule 61, 28 U.S.C.; Fed.R.Evid.Rule 103(a), 28 U.S.C. We accord similar deference to the trial court's determination that the probative value of the evidence is outweighed by its potential for prejudicing or confusing the jury. *Beacham*, 714 F.2d at 1014.

We hold that the court did not abuse its discretion in refusing to admit GM's crash test because it was not substantially similar to the accident in question, particularly when GM proffered no articulable engineering principles which the test was designed to demonstrate.

### (c)
### Court's Exclusion of Evidence of Comer's Intoxication

 GM contends that, under the court's articulated standard, once the Hindses made a prima facie case, the burden shifted to GM to prove that the Hindses' injuries were solely caused by something other than the seat belt. GM argues that under Oklahoma law, it should have

been allowed to introduce evidence of alcohol use. It cites *Kirkland v. General Motors Corp.*, 521 P.2d 1353 (Okla.1974) and *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48, 56–57 (Okla.1976), for the proposition that intoxication can be a sole cause absolving a defendant of liability. GM intended to prove that Comer's intoxication resulted in his exceeding the speed limit and was the sole cause of the accident.

 We hold that the district court properly excluded this evidence, as its probative value was substantially outweighed by the danger of unfair prejudice, confusion, and delay. Further, the cases cited by GM stand for the proposition that intoxication of a *plaintiff* may be admissible. Here, however, at no time was intoxication of Clyde Hinds in issue. The trial court correctly concluded that the prejudicial effect of any such evidence would clearly override any probative value. Moreover, if there is error in the admission or exclusion of evidence, we will set aside a jury verdict only if the error prejudicially affects a substantial right of a party. *Beacham*, 714 F.2d at 1014; *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1149 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). The effect on the jury of evidence can only be prejudicial if it can be reasonably concluded that with or without such evidence, there would have been a contrary result. *Smith v. Atlantic Richfield Co.*, 814 F.2d 1481 (10th Cir.1987).

(d)

*Court's Admission of Mertz
and Brady Memoranda*

 GM contends that the court erred in admitting the Mertz and Brady Memoranda. The Mertz Memorandum, drafted by one GM employee to another, and the Brady Memorandum, an unsigned document, each report criticisms of GM seat belt systems. According to GM, because the seat belt systems discussed in the Memoranda are not substantially similar to the system in the Hindses' Buick, these documents are irrelevant and inadmissible.

Further, because the Brady Memorandum is unsigned, it is unreliable.

GM cites three courts which have excluded the Mertz Memorandum from evidence in other seat belt cases. *See e.g., Puma v. General Motors Corp.*, No. 89–662–M (D.N.M. Aug. 30, 1990); *Lundin v. General Motors Corp.*, No. 88–0377–E (S.D.Cal. Sept. 9, 1988); *Kitts v. General Motors Corp.*, No. CIV 85–0967–JEC (D.N.M. Sept. 13, 1988). Additionally, GM notes that the *Puma* court excluded the Brady Memorandum because of lack of proper foundation.

However, other courts have ruled the Mertz Memorandum admissible. *See e.g., Kitts v. General Motors Corp.*, No. 85–0967–JEC (D.N.M. Sept. 13, 1988); *Baird v. General Motors*, No. C–84–2874–A (N.D. Ohio, Dec. 15, 1986). The Hindses argue that the Brady Memorandum was produced pursuant to a request for production of General Motors' records. They claim that any issue as to hearsay or this document's authenticity was not raised at the trial court and should not be heard on appeal.

The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Wheeler v. John Deere Co.*, 935 F.2d at 1099. In light of the split of decisions regarding the admissibility of the Mertz Memorandum and the failure to address the authenticity of the Brady Memorandum at the district court level, we hold that the trial court, which was familiar with the full scope of the evidence presented, did not abuse its discretion in admitting the documents.

There was no clear error or abuse of discretion in denying GM's request for a new trial.

We AFFIRM.