

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-28-1994

# Hook v. Enrst & Young

Precedential or Non-Precedential:

Docket 92-3724

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Hook v. Enrst & Young" (1994). *1994 Decisions.* Paper 62.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/62

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 92-3724
_____


DEBRA V. HOOK, an individual,
                    Appellant

                 v.

ERNST & YOUNG, a partnership,
                    Appellee


_____


Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 92-00748)

_____


Argued:  August 4, 1993

PRESENT:  STAPLETON, HUTCHINSON and ROTH, <u>Circuit Judges</u>

(Opinion Filed:  June 28, 1994)

_____


Louis M. Tarasi, Jr., Esquire
Joseph J. Hinchliffe, Esquire          (Argued)
Tarasi & Johnson
510 Third Avenue
Pittsburgh, PA      15219
          Attorney for Appellant

Paul A. Manion, Esquire
Mary-Jo Rebelo, Esquire
Manion, McDonough & Lucas
Suite 882
600 Grant Street
Pittsburgh, PA      15219

          and

Kathryn A. Oberly, Esquire
  Associate General Counsel
Thomas L. Riesenberg, Esquire          (Argued)
  Assistant General Counsel
Ernst & Young
Suite 400
1200 19th Street, N.W.
Washington, D.C.      20036

          and

Elizabeth B. Healy, Esquire
  Associate General Counsel
Ernst & Young
380 Madison Avenue
New York, NY      10017
              Attorneys for Appellee

_____

OPINION OF THE COURT
_____


HUTCHINSON, Circuit Judge.


        Appellant, Debra Hook ("Hook"), appeals a judgment the
United States District Court for the Western District of
Pennsylvania entered on a jury verdict for her former employer
appellee Ernst & Young.  Hook claims Ernst & Young intentionally
discriminated against her on the basis of sex in violation of
Title VII of the Civil Rights Act of 1964 ("Title VII"), 42
U.S.C.A. §§ 2000e to 2000e-17 (West 1981 & Supp. 1993), when it
terminated her employment.  On appeal, she contends that she was
entitled to a mixed-motives burden shifting jury instruction
under the 1991 amendments to Title VII and Price Waterhouse v.
Hopkins, 490 U.S. 228 (1989), and therefore the court erred in
charging the jury that it was her burden to show that sex was a

2

"determinative" rather than a "motivating" factor in the decision to terminate her.

More specifically, Hook argues section 107(a) of the Civil Rights Act of 1991 ("the 1991 Act"), codified at 42 U.S.C.A. § 2000e-2(m) (West Supp. 1993), automatically entitles Title VII plaintiffs who make out a prima facie case of illegal discrimination on a pretext theory to a motivating factor mixed-motives instruction. If a mixed-motives instruction is not required when a Title VII plaintiff's case depends on pretext, Hook argues in the alternative that she was entitled to a mixed-motives instruction because the evidence in this case showed the discriminatory animus Price Waterhouse requires.

We conclude that section 107 does not govern this case because that section does not apply to conduct occurring prior to its enactment in 1991. We also conclude that Hook has not produced the kind of evidence that would entitle her to a mixed motives, burden shifting instruction under Price Waterhouse.

Finally, we reject Hook's argument that a mixed-motives instruction is required whenever there is circumstantial evidence sufficient to establish a prima facie case under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). We think a holding to that effect would be in conflict with the teaching of the United States Supreme Court in St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2749 (1993). That case holds that a plaintiff who seeks to establish illegal discrimination on a pretext theory must persuade the factfinder not only that illegal

3

discrimination or bias was present but also that it was a cause of the act on which her Title VII claim is based. In contrast, a Price Waterhouse mixed-motives instruction, which requires evidence sufficient to show discriminatory animus more directly, implies cause and shifts to the employer the burden of persuading the factfinder its bias had, in fact, no causal connection with its act against the protected employee. Thus, in a mixed-motives case the employer must negate causation, i.e., persuade the factfinder it would have acted as it did even if it were not invidiously prejudiced. Therefore, we will affirm the district court's order entering judgment for Ernst & Young on the jury's verdict against Hook.

## I. Factual & Procedural History

Arthur Young & Co. ("Arthur Young"), a major accounting firm, hired Hook in June of 1989 as a tax senior, its lowest supervisory position. Hook had a law degree and work experience with another major accounting firm but was not a certified public accountant ("CPA"). At her job interview, Hook inquired when she might be eligible for promotion. James Chemel ("Chemel"), the director of the section which would employ Hook, stated that she would be promoted to tax manager within six months.

On October 1, 1989, Arthur Young merged with Ernst & Whinney to become Ernst & Young. After the merger, Chemel told Hook that the merger prevented him from promoting her to tax manager within the six months he had promised. Ernst & Young soon replaced Chemel with John McCann ("McCann"). He told Hook

4

that Ernst & Young preferred CPA's for promotion to that position.  A little later the staff in Ernst & Young's Pittsburgh office received a memorandum.  It stated that any person who sought promotion to tax manager had to pass the CPA examination.  This new policy had a grandfather clause excusing employees like Hook from the CPA requirement.

Ernst & Young rates its employees on a scale of one to five.  Five indicates the employee "consistently excels" but one indicates "unacceptable" performance.  As Hook continued at Ernst & Young, her performance reviews started to go downhill. In her first written evaluation in April of 1990 Hook received four "2s," three "3s," and one "4."  At her next evaluation in April of 1991 Hook received three "1s," two "2s," and one "3" from Chemel.  She received equally low ratings from McCann, her supervisor when she was terminated.

During the 1990 economic down-turn, Ernst & Young suffered a considerable loss of business and decided to reduce its workforce.  Between March and June of 1990 it fired seven members of its tax staff, six men and one woman.  In February 1991 Ernst & Young continued to contract its workforce and fired two more professionals from its tax staff.

In April 1991 McCann informed Hook she would be terminated because her projects were subject to "time overruns" and "she was the least good of those who were left."  Joint Appendix ("Jt. App.") at 452A. Two other tax professionals, one male and one female, were also fired at the same time.

5

Ernst & Young continued to cut back through early 1992 and many employees left the firm voluntarily. Of the fifty-five professionals Ernst & Young had employed in its Pittsburgh tax department at the time of the merger in October 1989, only twenty-two remained by November 1992. Sixteen of the thirty-three employees who were gone had been dismissed; four of the sixteen were women.

In December 1991 Hook sued Ernst & Young under Title VII alleging it intentionally discriminated against her because of sex when it terminated her.[1] At trial, Hook testified to three comments she found offensive. From them she seeks to infer that her supervisor, McCann, had a sexually discriminatory animus. She testified that on one occasion a client asked her how she could get out of her blouse because it buttoned in the back, to which McCann is said to have replied that he had buttoned it for her that morning. On a separate occasion, McCann allegedly told Hook she should "get [her] legs and ass over" to the client. Jt. App. at 148A. Hook testified McCann made one other "demeaning" remark but she was unable to recall the exact words, only the embarrassment it caused her.

Hook testified her work was of high quality. She also testified that Peter Stipanovich, another tax manager who was

---

[1]Hook also alleged violations of the Fair Labor Standards Act as amended by the Equal Pay Act, 29 U.S.C.A. §§ 201-219 (West 1965, 1978, 1985 & Supp. 1993), and the Pennsylvania Equal Pay Law, Pa. Stat. Ann. tit. 43, §§ 336.1-336.10 (1992). Ernst & Young removed the case to federal court. The district court entered judgment as a matter of law in favor of Ernst & Young on these claims at the close of Hook's case. Those orders are not appealed.

6

retained, was less qualified than she was and said two Ernst & Young partners had admitted she was better than Stipanovich. Her testimony that the Ernst & Young partners agreed with her about Stipanovich's relative merit was uncorroborated, and the Ernst & Young supervisors who testified all said Stipanovich was an able professional with good credentials. In particular, Adam S. Monks ("Monks"), an Ernst & Young partner, testified that Stipanovich was "very knowledgable [sic] about and is considered one of the most knowledgable [sic] in the office" on taxation of partnerships. Id. at 383A. Similarly, Chemel testified that Stipanovich was "above average" in competence, ability and work performance. Id. at 402A. The record also shows Stipanovich was a CPA with a degree from the University of Pennsylvania's Wharton School of Business.

After the close of all evidence, in conference with the parties, the court proposed the following jury charge:

> The question for you, members of the jury, is whether plaintiff's sex was a determinative factor in the discharge of plaintiff. . . . Plaintiff need not prove that her sex was the sole factor motivating the defendant. However, plaintiff must prove that she would not have been discharged if the fact that she is a woman had not been taken into account.
>
> The issue you are to decide is whether plaintiff's sex was a determinative factor in the defendant's discharge of plaintiff. The issue is not whether the plaintiff was treated fairly or whether there was a personality conflict between the plaintiff and her superiors or whether she was treated differently than other employees or whether the defendant made sound management decisions.

> You are not to decide whether you agree or disagree with the defendant's actions. You are to decide whether plaintiff's sex was <u>a determinative factor</u> in defendant's discharge of plaintiff.
>
> If you find that the defendant discharged plaintiff for reasons in which her sex was not <u>a determinative factor</u>, then you must return a verdict in favor of defendant.

<u>Id.</u> at 503A-05A (emphasis added). Hook objected to this proposed charge and argued that in all Title VII individual discrimination cases, the prohibited consideration need only be a "motivating" rather than a "determinative" factor under section 107(a) of the 1991 Act. Hook requested a point for charge stating "[a]n unlawful employment practice is established when the complaining party establishes that sex was <u>a motivating factor</u> in the decision to terminate that complaining party's employment even though other factors motivated the practice." Brief for Appellant at 10 n.4 (emphasis added). The district court stated it was granting Hook's point "in other words," Jt. App. at 500A, but denied her request to change the proposed charge. The court later observed that Ernst & Young defended the case solely on a pretext theory and a "motivating factor" instruction was only appropriate in a mixed-motives case. <u>Id.</u> at 508A.

During deliberations, the jury asked the court to "define . . . the precise meaning of . . . determinative factor." <u>Id.</u> at 552A. In response, the district court repeated its charge and then added "[t]he term 'determinative factor' as used in your instructions, means a factor that is causally connected to the

8

result; in this case, the discharge of plaintiff.  It need not be the sole cause of the result, since multiple factors might cause a particular result."  Id. at 553A (emphasis added).  The jury returned a verdict in favor of Ernst & Young.  After her post-trial motions including her motion for new trial were denied, Hook filed a timely notice of appeal.

II.   Jurisdiction & Standard of Review

The district court had subject matter jurisdiction over Hook's claim pursuant to 28 U.S.C.A. § 1331 (West 1993) and 42 U.S.C.A. § 2000e-5(f)(3).  We have appellate jurisdiction over the appeal from the final order of the district court pursuant to 28 U.S.C.A. § 1291 (West 1993).

Normally we review a district court's denial of a motion for a new trial for abuse of discretion, but where the denial of the motion was based on the application of legal precepts we exercise plenary review.  Griffiths v. CIGNA Corp., 988 F.2d 457, 462 (3d Cir.) (citing Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992)), cert. denied, 114 S. Ct. 186 (1993).  Similarly, while we ordinarily review a district court's rulings on points for charge for abuse of discretion, Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 922 (3d Cir. 1986), we exercise plenary review where the appellant contends that the charge does not state the correct legal standard.  Griffiths, 988 F.2d at 462 (citing Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989)).  Where a jury charge is attacked for legal error we must determine whether "the charge [taken] as a whole fairly and

9

adequately submits the issues in the case to the jury."  <u>Bennis</u>

<u>v. Gable</u>, 823 F.2d 723, 727 (3d Cir. 1987).  We will reverse

"'only if the instruction was capable of confusing and thereby

misleading the jury.'"  <u>Id.</u> (citation omitted); <u>see</u> <u>also</u>

<u>Griffiths</u>, 988 F.2d at 462.


                                III.

          Hook contends she was entitled to an instruction using

the words "motivating factor" based on section 107(a) of the 1991

Act.  The 1991 Act amended 42 U.S.C.A. § 2000e-2 by adding a new

subsection.  Section 107(a), codified at section 2000e-2(m),

provides:

> **(m)  Motivations for practice**
>
>          Except as otherwise provided in this
> subchapter, an unlawful employment practice
> is established when the complaining party
> demonstrates that . . . sex . . . was <u>a</u>
> <u>motivating</u> <u>factor</u> for any employment
> practice, even though other factors also
> motivated the practice.


42 U.S.C.A. § 2000e-2 (emphasis added).  Portions of the

legislative history indicate a purpose of this amendment was to

partially overrule that part of <u>Price Waterhouse</u> which exempted

employers from liability and precluded any Title VII remedy if

they could produce evidence and persuade a factfinder that an

adverse employment decision would have been made regardless of

the fact that a discriminatory motive was one of the factors

influencing the decision.  Thus, as the House Report states:

> When Congress enacted the Civil Rights
> Act of 1964, it precluded all invidious

10

consideration of a person's race, color, religion, sex or national origin in employment.  The effectiveness of Title VII's ban on discrimination on the basis of race, color, religion, sex or national origin has been severely undercut by the recent Supreme Court decision in Price Waterhouse v. Hopkins, 109 S.Ct. 1775 (1989).  In that case, the Supreme Court concluded that "when a plaintiff . . . proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability . . . by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account."  Id. at 1795 (emphasis added).

*     *     *

To establish liability under proposed Subsection 703(1), the complaining party must demonstrate that discrimination actually contributed or was otherwise a factor in an employment decision or action.  Thus, in providing liability for discrimination that is a "contributing factor," the Committee intends to restore the rule applied in many federal circuits prior to the Price Waterhouse decision that an employer may be held liable for any discrimination that is actually shown to play a role in a contested employment decision.

Section 203 of the bill also amends Subsection 706(g) of Title VII to make clear that where a violation is established under Subsection 703(1), and where the employer establishes that it would have taken the same action in the absence of any discrimination, a court may not order the employer to hire, reinstate, promote or provide back pay to the complainant.  This provision is consistent with the current text of Title VII, which provides that "no order of the court shall require the admission or reinstatement of an individual . . . if such individual . . . was refused employment . . . for any reason other than discrimination."  42 U.S.C. § 2000e-5(g).

11

* * *

> However, the presence of a contributing
> discriminatory factor would still establish a
> Title VII violation, and a court could order
> other appropriate relief, including
> injunctive or declaratory relief,
> compensatory and punitive damages where
> appropriate, and attorney's fees.

H.R. Rep. No. 102-40(I), 102d Cong., 1st Sess. 45, 48-49,

reprinted in, 1991 U.S.C.C.A.N. 549, 583, 586-87 (emphasis in

original) (footnotes omitted).

Ernst & Young insists that Price Waterhouse and not

section 107 provides the rule of decision in this case because

that section is not to be applied in cases involving preenactment

conduct.  We agree.

The Supreme Court recently spoke to the retroactivity

issue in the context of other portions of the 1991 amendments.

Landgraf v. USI Film Prods., 62 U.S.L.W. 4255 (Apr. 26, 1994)

(Section 102); Rivers v. Roadway Express Inc., 62 U.S.L.W. 4271

(Apr. 26, 1994) (Section 101).  Landgraf dealt with section 102

which for the first time imposes liability for compensatory and

punitive damages when a violation of Title VII has been shown.

The Court gave the following instructions, which are pertinent

here:

> When a case implicates a federal statute
> enacted after the events in suit, the court's
> first task is to determine whether Congress
> has expressly prescribed the statute's proper
> reach.  If Congress has done so, of course,
> there is no need to resort to judicial
> default rules.  When, however, the statute
> contains no such express command, the court

12

must determine whether the new statute would have retroactive effect, _i.e._, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.  If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

_Landgraf_, 62 U.S.L.W. at 4265-66.

Following this analysis, the Court in _Landgraf_ first concluded that neither the text of the amendments nor the legislative history, with two exceptions not relevant, reflects Congress's intent on the issue of retroactivity.  _Id._ at 4260-61. "Instead, [the Court noted,] the history of the 1991 Act conveys the impression that legislators agreed to disagree about whether and to what extent the Act would apply to preenactment conduct." _Id._ at 4261.

Turning to section 102, the Court had no difficulty concluding that Congress's imposition of punitive damages should not be applied to preenactment conduct.  _Id._ at 4266. Compensatory damages, however, posed a more difficult issue:

The provision of § 102(a)(1) authorizing the recovery of compensatory damages is not easily classified.  It does not make unlawful conduct that was lawful when it occurred; as we have noted, _supra_, at 6-8, § 102 only reaches discriminatory conduct already prohibited by Title VII.

*     *     *

Nonetheless, the new compensatory damages provision would operate "retrospectively" if it were applied to conduct occurring before November 21, 1991.

13

> Unlike certain other forms of relief, compensatory damages are quintessentially backward-looking. Compensatory damages may be _intended_ less to sanction wrongdoers than to make victims whole, but they do so by a mechanism that affects the liabilities of defendants. They do not "compensate" by distributing funds from the public coffers, but by requiring particular employers to pay for harms they caused. The introduction of a right to compensatory damages is also the type of legal change that would have an impact on private parties' planning.
>
> *     *     *
>
> Because Title VII previously authorized recovery of backpay in some cases, and because compensatory damages under §102(a) are in addition to any backpay recoverable, the new provision also resembles a statute increasing the amount of damages available under a preestablished cause of action. Even under that view, however, the provision would, if applied in cases arising before the Act's effective date, undoubtedly impose on employers found liable a "new disability" in respect to past events. _See_ _Society for Propagation of the Gospel_, 22 F. Cas., at 767. The _extent_ of a party's liability, in the civil context as well as the criminal, is an important legal consequence that cannot be ignored.

_Id._ at 4266-67 (emphasis in original) (footnotes omitted). The new provision regarding compensation was, therefore, held to apply only to conduct occurring after Congress passed the 1991 Amendments.

In _Rivers_, the Court relied on _Landgraf_ to conclude that section 101, which amended 42 U.S.C.A. § 1981 by defining the term "make and enforce contracts" broadly to embrace all phases of the contractual relationship including discriminatory

14

contract terminations, enlarges the category of conduct subject to section 1981 liability and therefore does not apply to cases pending when it was enacted. Rivers, 62 U.S.L.W. at 4272. The Court also rejected an argument that because Congress intended to alter the rule of law established in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the amendment was restorative and the section should be applied retroactively. Although restorative intent is apparent, such intent does not reveal whether Congress intended the amendment to apply retroactively. Id. at 4272-75.

The Court's holdings in Landgraf and Rivers do not answer the question before us. As the Court observed in Landgraf, "there is no special reason to think that all the diverse provisions of the Act must be treated uniformly for [these] purposes. . . . [C]ourts should evaluate each provision of the Act in light of ordinary judicial principles concerning the application of new rules to pending cases and pre-enactment conduct." Landgraf, 62 U.S.L.W. at 4266. Landgraf and Rivers, however, do provide a basis for confident prediction regarding section 107.

As Justice Brennan in his plurality opinion in Price Waterhouse states, "[t]he specification of the standard of causation under Title VII is a decision about the kind of conduct that violates that statute." Price Waterhouse, 490 U.S. at 237. Section 107, by changing the standard of causation under Price Waterhouse, expands the types of conduct that violate the Act. Prior to section 107, an employer did not violate the Act if it considered an employee's protected trait when deciding to take an

15

adverse employment action, so long as it also considered other factors that would have caused it to make the same decision in the absence of the unlawful consideration. After the enactment of section 107, an employer making exactly the same kind of decision could violate the Act. This would change "the kind of conduct that violates th[e] statute." Price Waterhouse, 490 U.S. at 237. Moreover, to the extent that section 107 is meant to be restorative of pre-Price Waterhouse law, our examination of the statutory language and the legislative history uncovers no indication that Congress intended the amendment to apply retroactively.

"Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." Landgraf, 62 U.S.L.W. at 4261 (footnote omitted). If an amendment imposing liability for compensatory damages for conduct already unlawful sufficiently disrupts settled expectations to foreclose retroactive application, so too does an amendment that renders previously lawful conduct unlawful. Accordingly, Landgraf and Rivers preclude us from giving section 107 the retroactive application that Hook desires.

IV.  Analysis under Price Waterhouse

Although the 1991 Amendment does not apply retroactively, we must still consider Hook's Price Waterhouse

16

argument that the district court should have granted her request for a mixed-motives burden-shifting charge.[2]

Whether a pretext or a mixed-motives case has been presented depends on the kind of circumstantial evidence the employee produces in support of her claim of illegal discrimination.  Not all evidence that is probative of discrimination entitles an employee to a Price Waterhouse mixed-motives charge.  See Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 181 (2d Cir. 1992).  Thus, in Price Waterhouse, Justice O'Connor stated in her concurrence that the employee has to show the employer's mixed motives by "direct evidence that an illegitimate criterion was a substantial factor in the decision." Price Waterhouse, 490 U.S. at 276 (O'Connor, J., concurring). Specifically,

> stray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria.  Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the

---

[2]Ernst & Young argues Hook waived this issue because she did not raise it until supplemental points for charge were submitted. It notes the district court specifically declined to give Hook's mixed-motives instruction because mixed-motives was "not the position that the defendant has taken in this case at all."  Jt. App. at 508A.  A trial judge has discretion to decide what points for charge are appropriate based on the evidence presented by the parties during the trial.  See, e.g., Hinds v. General Motor Corp., 988 F.2d 1039, 1046 (10th Cir. 1993) (error for trial court to give instruction on theory not supported by competent evidence).  In the district court Ernst & Young failed to object to Hook's supplemental point for charge on the theory it now raises; therefore, Ernst & Young's waiver argument may itself be subject to waiver.  Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 116 (3d Cir. 1992), cert. denied, 113 S. Ct. 1645 (1993).

17

> plaintiff's burden in this regard. . . . [I]n
> the context of this case, a mere reference to
> "a lady candidate" might show that gender
> "played a role" in the decision, but by no
> means could support a rational factfinder's
> inference that the decision was made "because
> of" sex.

Id. at 277 (O'Connor, J., concurring).  In Ostrowski the United

States Court of Appeals for the Second Circuit criticized the

phrase "'direct evidence'" as "'an unfortunate choice of

terminology for the sort of proof needed to establish a "mixed-

motives" case.'"  Ostrowski, 968 F.2d at 181 (quoting Tyler v.

Bethlehem Steel Corp., 958 F.2d 1176, 1185 (2d Cir.), cert.

denied, 113 S. Ct. 82 (1992)).[3]  According to Ostrowski, there is

typically no direct evidence because the decisionmaker is

unlikely to admit that he fired an employee because of age or

sex.  Id. at 181-82.  Ostrowski nevertheless recognizes that

circumstantial evidence "tied directly to the alleged

discriminatory animus" must be produced to justify a burden-

shifting instruction.  Id. at 182.  It described the

circumstantial evidence that shows mixed-motives in a way that

---

[3]Despite Judge Kearse's criticism in Ostrowski of Justice
O'Connor's use of the phrase "direct evidence" to distinguish the
evidence needed to present a mixed-motives as opposed to a
pretext case, it seems to us to be a convenient shorthand term.
Of course, it is, in a sense, circumstantial, but it is not
circumstantial in the same sense as the evidence that makes out a
pretext case.  In a mixed-motives case the defendant condemns
himself of invidious discrimination out of his own mouth or by
his own overtly biased acts.  In a pretext case he lies or masks
the reason for his act.  He is, like the serpent in Eden, more
subtle.

18

shows it is different from the kind of "circumstantial evidence" that makes out a pretext case.  It said:

> For example, purely statistical evidence would not warrant such a charge; nor would evidence merely of the plaintiff's qualification for and availability of a given position; nor would "stray" remarks in the workplace by persons who are not involved in the pertinent decisionmaking process.  Those categories of evidence, though they may suffice to present a prima facie case under the framework set forth in [McDonnell Douglas] and [Burdine], and may indeed persuade the factfinder that the plaintiff has carried his or her ultimate burden of persuasion, would not suffice, even if credited, to warrant a Price Waterhouse charge.  If, however, the plaintiff's nonstatistical evidence is directly tied to the forbidden animus, for example policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden-shifting instruction.

Id. (citations omitted).

Absent evidence that could "fairly be said to 'directly reflect'" the alleged unlawful basis, the case should be treated as a pretext case.  Griffiths, 988 F.2d at 470.

It is clear, however, that "'[n]ot all evidence that is probative of discrimination will entitle the plaintiff to [shift the burden]' to the defendant under Price Waterhouse." Griffiths, 988 F.2d at 470 (quoting Ostrowski, 968 F.2d at 181). The burden of persuasion shifts to the employer "only after the plaintiff ha[s] proven that her employer acted unlawfully," and not merely "on the basis of a prima facie showing."  Binder v. Long Island

19

Lighting Co., 933 F.2d 187, 192 n.1 (2d Cir. 1991); see also Schleiniger v. Des Moines Water Works, 925 F.2d 1100, 1101 (8th Cir. 1991) ("Simply because a discriminatory reason might be inferred from a prima facie case does not mean that a mixed motive case exists."). Evidence establishing a prima facie case is not always sufficient to require or permit a mixed-motives burden shifting instruction. Such a result would merge the two different theories, mixed-motives and pretext, into one cause of action. Every pretext case would then require a mixed-motives instruction and that instruction would shift to the employer the production and persuasion burdens of negating any causal connection between the employer's action and illegal discrimination instead of requiring the employee to show pretext and to persuade the factfinder that illegal discrimination was the legal cause of the action against her. See St. Mary's, 113 S. Ct. at 2749. As we noted in Griffiths, 988 F.2d at 471-72, the Supreme Court has taken great pains to differentiate between the two theories. See, e.g., Price Waterhouse, 490 U.S. at 245-47.

Therefore, to the extent Hook argues that production of evidence sufficient to show a McDonnell Douglas/Burdine prima facie case is evidence of discrimination sufficient to warrant a mixed-motives instruction, we think she misstates the law. See Griffiths, 988 F.2d at 470; see also Binder, 933 F.2d at 192 n.1.

Hook also argues that she was entitled to a Price Waterhouse charge because she produced the kind of evidence needed to require such charge. We reject this argument.

She relied on her own qualifications as well as McCann's offensive remarks about her blouse and her body. With respect to qualifications, her performance reviews were largely negative. Moreover, it was Ernst & Young's policy not to promote individuals like Hook who had failed to complete the CPA exam. Only the grandfather clause permitted Hook to advance as far as she did.

Ernst & Young was in the process of reducing its professional workforce in the tax field. It dismissed sixteen professional tax employees in the relevant time period, twenty-five percent of whom were women. According to McCann, Hook was terminated simply because she was "the least good of those who were left." Jt. App. at 452; cf. Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 517 (6th Cir. 1991) ("a plaintiff whose employment position is eliminated in a corporate reorganization or work force reduction carries a heavier burden in supporting charges of discrimination than does an employee discharged for other reasons").

As to the "sexual advances and indelicacies" allegedly made by McCann, Brief for Appellant at 21, isolated remarks are not enough under Price Waterhouse to warrant a mixed-motives burden shifting instruction. McCann's statements were stray remarks. Although they were made by a decisionmaker, there is no evidence they were related to the decision process. They were temporally remote and they had nothing to do with Hook's job performance.

21

Alternatively, Hook argues a mixed-motives charge was warranted because the evidence she produced was enough to show a male employee, Peter Stipanovich, was less qualified than she for the job she lost but he was retained. This evidence merely supplies part of her McDonnell Douglas/Burdine prima facie case. For the same reasons, it is not direct evidence of mixed motives.

The evidence that showed a mixed-motives case in Price Waterhouse is different. There, comments in the performance evaluations upon which the decisionmakers based their decision to terminate the plaintiff included impermissible sexual stereotypes,[4] and they were an integral part of the decision process directly relating to the employer's assessment of its female employee's ability to interact with clients and perform her job. Price Waterhouse, 490 U.S. at 232-37.[5] Similarly, in Tyler, another mixed-motives age discrimination case, the evidence presented included a statement by the defendant that its sales force was "getting too old," that the plaintiff was replaced by a younger employee and documentary evidence

_____

[4]These comments included: (1) descriptions of Hopkins as "'macho'"; (2) a "suggestion that she 'overcompensated for being a woman'"; (3) advice "to take 'a course at charm school'"; and (4) criticism of her use of profanity "'because it's a lady using foul language.'" Price Waterhouse, 490 U.S. at 235. The clincher for the plurality in Price Waterhouse was, however, the fact that a decisionmaker, while explaining to Hopkins why she was not given partnership, advised her that in the future she should "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" Id. (citation omitted).
[5]In Price Waterhouse the district court found that the employer had never disavowed reliance on these comments in the evaluations which plainly showed an illegal discriminatory animus against women. Price Waterhouse, 490 U.S. at 236-37.

22

indicating the defendant maintained a group called the "Young Tigers" from which the plaintiff was, by definition, excluded. Tyler, 958 F.2d at 1186-87; see also Ostrowski, 968 F.2d at 183 (age discrimination case with "explicit evidence of . . . age-based animus" such as decisionmakers' statements that "there is no way [a 60 year old employee] can contribute," that two ADEA-protected employees hired by plaintiff should not have been hired and instead should have remained in retirement and that Ostrowski should be fired because he hired older employees).

McCann's remarks are insufficient to show that sexual bias tainted any employment decision he made. None of the evidence concerning the termination of Hook nor the retention of Stipanovich is sufficient to show that a discriminatory animus against women existed at Ernst & Young when Hook was fired. Accordingly, the district court did not err in refusing to give a Price Waterhouse burden-shifting instruction in this case.

V.

For the foregoing reasons, the order of the district court will be affirmed.

23