

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-1997

# Walden v. Georgia Pacific Corp

Precedential or Non-Precedential:

Docket 96-7045

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Walden v. Georgia Pacific Corp" (1997). *1997 Decisions.* Paper 233.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/233

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 26, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 96-7045

LINDA S. WALDEN; JAMES P. MURPHY;
GEORGE C. POIRIER,
APPELLANTS

v.

GEORGIA-PACIFIC CORP.; VIRGIL H. GARDNER;
MICHAEL A. VIDAN; HOWARD SCHUTTE; DAVID M.
WATSON; CURT RIGGIN; ROBERT LINDSEY; JAMES R.
HURD; FELMER CUMMINS; GEORGE FOSTER; RICH
MOODY; JOHN DOE; JANE DOE

On Appeal From the United States District Court
For the District of Delaware
(D.C. Civ. No. 92-cv-00735)

Argued: June 5, 1997

Before: BECKER, SCIRICA, Circuit Judges, and
KELLY, District Judge.*

(Filed September 26, 1997)**

_____

*Honorable James McGirr Kelly, United States District Judge for the
Eastern District of Pennsylvania, sitting by designation.

**A non-final draft of the Opinion in this matter was issued September
23, 1997, by reason of certain mechanical errors. That version has been
rescinded, and the correct final draft is filed herein.

DENNIS K. KUROISHI, ESQUIRE
 (ARGUED)
7 East Kings Highway
Mt. Ephraim, New Jersey 08059

Attorneys for Appellants

KEVIN M. INGHAM, ESQUIRE
R. STEVE ENSOR, ESQUIRE
 (ARGUED)
Alston & Bird
1201 West Peachtree Street
One Atlantic Center
Atlanta, GA 30309

DAVID H. WILLIAMS, ESQUIRE
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899-2306

Attorneys for Appellees

OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by plaintiffs Linda S. Walden, James P. Murphy, and George C. Poirier from an order of the district court denying them a new trial in an employment discrimination case following a jury verdict in favor of the defendant, Georgia-Pacific Corporation. The plaintiffs contend that the district court abused its discretion in not granting them a new trial in the face of errors in the jury charge and in the exclusion of certain evidence. We affirm.

First, we reject plaintiffs' contention that their proffered evidence of retaliatory animus was sufficiently "direct" to require a burden shifting "mixed-motives" charge under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). Second, while we believe that the district court erred in excluding certain evidence of retaliatory animus, we do not believe

2

that it committed plain error in doing so. The evidence involved remarks by Georgia–Pacific employees outside the chain of decisionmakers who had authority to hire and fire the plaintiffs. The district court excluded the evidence at an in limine hearing, at which time the district court described its actions as only "tentative". Although the district court gave certain indications at the hearing that its rulings might be final, it never countermanded its description of them as "tentative." Thus, we do not believe that the rulings were sufficiently final under the doctrine of American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321 (3d Cir. 1985), to excuse the plaintiffs' obligation to make an offer of proof at trial and to preserve the issues for abuse of discretion review. Since no objections were made at trial, we review only for plain error and, inasmuch as the excluded evidence was cumulative of other evidence of corporate animus (which the jury obviously rejected), we find none.

Finally, addressing a question of first impression at the circuit level, we reject plaintiffs' contention that the district court erred in excluding evidence of the conviction of Georgia–Pacific for tax evasion which plaintiffs offered to impeach the defendant's witnesses. We conclude that Fed. R. Evid. 609 does not permit corporate convictions to be used to impeach the credibility of employee witnesses who are not directly connected to the underlying criminal act. Since there was no evidence of such a connection in the present case, the district court properly excluded the Georgia–Pacific convictions as improper impeachment evidence.

I. Facts and Procedural History

The plaintiffs, Walden, Murphy, and Poirier, constituted the security unit at the Wilmington, Delaware, plant of Georgia–Pacific's Gypsum and Roofing Division. Walden was hired as a guard in 1975, followed by Poirier in 1977 and Murphy in 1984. The events that gave rise to this lawsuit began in August 1990 when a fourth guard, John Crothers, was fired, according to Carolyn Wunsch, the personnel manager of the Wilmington plant, for a "breach of security." In September 1990, Crothers was replaced by a younger

woman, Phyllis Estepp. In October 1990, Crothers filed an EEOC charge alleging unlawful age and sex discrimination. He named the three plaintiffs as witnesses to his job performance during his employment with Georgia-Pacific.

On May 7, 1991, all three plaintiffs met with an EEOC investigator concerning Crothers' charge. They testified at trial that, despite Wunsch's request that they mislead the EEOC investigator about Crothers' performance and make statements favorable to the company, they made truthful statements to the investigator. On May 14, 1991, Wunsch informed the plaintiffs that Estepp was to be replaced by OSS Security, an outside security agency that would provide weekend security at the plant. The plaintiffs offered to give up their overtime on weekends to keep all four guards employed, but Wunsch refused their offer. Estepp was soon fired, and OSS began to provide the weekend security services. Estepp filed discrimination charges with the EEOC, claiming that she was unlawfully discharged on the basis of her sex.

In July 1991, Wunsch established a mandatory rotation for the plaintiffs' shifts and directed them not to swap their assigned hours. Prior to this change, the plaintiffs had worked out their own rotations, which permitted them to take account of family and personal obligations. Because of these changes in their working conditions, the plaintiffs filed their own charges with the EEOC in August 1991.

In October 1991, the plaintiffs invoked the company's "open door" policy, sending a letter outlining their complaints to Donald Glass, the Senior Vice President of the division, which was based in Atlanta. Glass forwarded the letter to Michael Vidan, the division's Vice President. In November 1991, Vidan wrote to the plaintiffs, informing them that James Hurd, the division's Corporate Personnel and Labor Relations Manager, would investigate their complaints and get back to them. The plaintiffs never heard anything further on the subject. Walden testified that she approached several plant officials about the plaintiffs' complaints over the next couple of months, but they refused to speak to her about them, informing her that they had been directed to stay out of the dispute. In February 1992, Hurd arrived from Atlanta and fired the plaintiffs.

4

The plaintiffs filed retaliation charges with the EEOC,
contending that they had been wrongfully terminated for
protected activity in violation of Title VII, 42 U.S.C. S 2000e-
3(a)(1996).1 After receiving a right to sue letter from the
EEOC, the plaintiffs filed a complaint in the District Court
for the District of Delaware.2 The case was tried to a jury on
one count of retaliatory discharge in December 1995.3

At trial, Georgia-Pacific introduced evidence that the
plaintiffs were fired to effect large cost savings. Wunsch
testified that she proposed contracting out the security
services after the temporary employment of an outside
agency during the 1990 Christmas season demonstrated
its cost effectiveness. In February 1991, she, George
Woodham, the Wilmington plant Production
Superintendent, and Dave Watson, the division's
Production Manager, raised the idea with Montgomery
Palmowski, the Wilmington plant manager. Palmowski
rejected the proposal to replace all the guards, but agreed
to replace one of the guards with an outside service on
weekends. According to Wunsch's testimony, Estepp was
replaced because she was the least senior guard. Howard
Schutte, the division's Operations Manager, testified that,
in January 1992, he received a memorandum from Charles
Terry, named interim Wilmington plant manager after
Palmowski was fired, recommending that the entire guard
unit be replaced to save costs. Based on this
recommendation, Schutte decided to discharge the

_____

1. The plaintiffs' original complaint alleges that the defendants
retaliated
against the plaintiffs because they (1) cooperated with the EEOC in its
investigation of the charges filed by Crothers and Estepp; (2) refused to
lie to the EEOC to protect the company in the Crothers and Estepp
investigations; and (3) filed complaints with the EEOC alleging
retaliation
for their participation in the Crothers and Estepp matters.

2. The plaintiffs initially named many Georgia-Pacific executives and
managers as defendants. They voluntarily dismissed the claims against
all the individual defendants except Virgil Gardner, the division's
Manager of Industrial Relations and EEO Coordinator.

3. The district court granted summary judgment for the defendants on
several of plaintiffs' claims--retaliation in failure to rehire,
defamation
against Gardner, and breach of contract--and hence only the retaliatory
discharge claim went to the jury.

plaintiffs. According to Georgia-Pacific, the elimination of the plaintiffs' jobs was consistent with other cost-cutting measures employed in the division between 1990 and 1992.

The jury returned a verdict in Georgia-Pacific's favor. The plaintiffs filed a motion for a new trial, Fed. R. Civ. P. 59, which the district court denied. This appeal followed. The district court exercised subject matter jurisdiction under 28 U.S.C. S 1331, and we have appellate jurisdiction over its final order under 28 U.S.C. S 1291.

II. The Jury Instruction: Did the Plaintiffs Introduce at Trial Sufficient "Direct" Evidence of Retaliatory Animus to Qualify for a Mixed Motives Instruction Under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989)?

The district court, over the plaintiffs' objection, gave the jury a pretext charge. On appeal, the plaintiffs contend that they introduced at trial sufficient "direct" evidence of retaliatory animus to qualify for a mixed motives instruction under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).4 In a mixed motives case, the evidence put forth

_____

4. The plaintiffs object to the jury instructions in several additional respects. First, they submit that the evidence shows that Georgia-Pacific failed to investigate the plaintiffs' October 1991 letter of complaint in accordance with the company's "open door" policy. Based on this evidence, they contend that the district court erred in failing to instruct
the jury that Georgia-Pacific's act of "closing" the open door policy gave rise to a cause of action. The plaintiffs, however, did not properly plead this as a cause of action either in their complaint or pre-trial memorandum. Both documents plead only wrongful discharge as a cause of action, listing the closing of the open door policy as a piece of evidence that they would prove at trial to support their wrongful discharge theory. Alternatively, the plaintiffs contend that the district court erred in refusing to instruct the jury that the letter to Glass constituted protected activity. As a matter of law, this letter could not constitute protected activity. Rather, it was a general grievance about changes in working conditions, the perceived threat to the plaintiffs' job security, and the derogatory comments made by Virgil Gardner about them. It did not complain of any acts that are unlawful under Title VII. See Barber v. CSX Distrib. Servs., 68 F.3d 694 (3d Cir. 1994). At all events, any error in this respect would be harmless. The plaintiffs were able to put on all of their evidence about the letter to Glass and the

6

by the plaintiff is so revealing of retaliatory animus that it is unnecessary to rely on the McDonnell Douglas /Burdine burden-shifting framework, under which the burden of proof remains with the plaintiff. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981). Rather, the burden of production and risk of nonpersuasion shift to the defendant, which must show that, even if retaliation was a motivating factor in the adverse employment decision, it would have made the same employment decision in the absence of retaliatory animus. See Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir. 1994).[5] We generally review jury instructions for abuse of discretion, but our review is plenary when the question is whether the instruction misstates the law, see Savarese v. Agriss, 883 F.2d 1194, 1202 (3d Cir. 1989), as the plaintiffs here contend.

As we have explained in prior cases, whether a plaintiff has presented a pretext or a mixed motives case depends on the quality of the evidence that the plaintiff adduces in support of the claim of illegal discrimination. See Wilson v. Susquehanna Township Police Dep't, 55 F.3d 126 (3d Cir.

_____

subsequent investigation, or lack thereof, as evidence of the company's retaliation for protected activity. Moreover, plaintiffs' counsel was permitted to refer to the letter as protected activity in his closing argument to the jury.

Additionally, plaintiffs contend that, because the Civil Rights Act of 1991 governs their claim, the district court should have instructed the jury that it could find for the plaintiffs if unlawful retaliation was a "motivating factor" in the plaintiffs' discharge. Our decision in Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997), decided after the plaintiffs filed their brief in this appeal, forecloses this contention. Under Woodson, the "motivating factor" standard of S 107 of the 1991 Act does not apply to retaliation claims. See id. at 935.

5. The differences between the burden-shifting framework of pretext cases under McDonnell Douglas and Burdine, and mixed-motives cases under Price Waterhouse have been amply explained in prior cases, and we need not dwell on them here. See, e.g., Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1095-96 n.4 (3d Cir. 1995); Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1224-25 (3d Cir. 1994).

1995); Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089 (3d Cir. 1995); Armbruster, 32 F.3d 768; Hook v. Ernst & Young, 28 F.3d 366 (3d Cir. 1994). Not all evidence that is probative of illegitimate motives suffices to entitle a plaintiff to a mixed-motives/Price Waterhouse charge. Rather, as Justice O'Connor explained in her Price Waterhouse concurrence, the employee must show "direct evidence that an illegitimate criterion was a substantial factor in the decision." Price Waterhouse, 490 U.S. at 276 (O'Connor, J., concurring) (emphasis added). In other words, the evidence must be such that it demonstrates that the "decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision." Id. at 277.

In point of fact, the term "direct evidence" is somewhat of a misnomer, for we have held that certain circumstantial evidence is sufficient for a mixed motives instruction, if that evidence can " `fairly be said to directly reflect' the alleged unlawful basis" for the adverse employment decision. Hook, 28 F.3d at 374 (quoting Griffiths v. CIGNA Corp., 988 F.2d 457, 470 (3d Cir. 1993), overruled on other grounds, Miller v. Cigna Corp., 47 F.3d 586 (3d Cir. 1995)(en banc)). We have also repeatedly made clear that a plaintiff must clear a high hurdle to qualify for a mixed motives instruction: "The burden of persuasion shifts to the employer`only after the plaintiff ha[s] proven that her employer acted unlawfully,' and not merely `on the basis of a prima facie showing.' " Hook, 28 F.3d at 374 (quoting Binder v. Long Island Lighting Co., 933 F.2d 187, 192 n.1 (2d Cir. 1991)). Put differently, a mixed motives instruction is warranted only when the "evidence is sufficient to permit the factfinder to infer that [a discriminatory] attitude was more likely than not a motivating factor in the employer's decision." Griffiths, 988 F.2d at 470.

Justice O'Connor shed light on what constitutes such "direct" evidence as follows:

> [S]tray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the

8

decisional process itself, suffice to satisfy the plaintiffs' burden in this regard.

Price Waterhouse, 490 U.S. at 277 (internal citations omitted). This is borne out in Armbruster, supra, an ADEA case. There the plaintiffs introduced age-related comments by a Unisys Vice-President, Robert Markell. Markell had resigned at least three months before the adverse employment actions at issue, but several months before he resigned, Markell allegedly stated that Unisys could not "afford to keep people over 50 and 50," meaning those over 50 years of age who were earning over $50,000 a year. Yet we held that not even this statement was sufficient direct evidence to require a mixed motives charge.

Markell had testified that he had no connection with the challenged employment decision, although in his capacity as Vice President he was often involved in hiring and firing decisions. We concluded that "Markell's alleged statement is not attributable to a decisionmaker connected with the . . . employment decisions and is too remote in time. . . to constitute overt evidence sufficient to show Unisys had a discriminatory animus towards older employees." Armbruster, 32 F.3d at 779. Thus, statements that are unconnected to the decision at issue, even if made by people who hold positions of authority with the employer, are not direct evidence of unlawful discharge.

The plaintiffs point to several pieces of evidence that they contend, taken together, constitute sufficient direct evidence to entitle them to a mixed motives charge. First, they point to testimony that, in December 1990, plaintiff Walden was subpoenaed as a witness in an arbitration hearing for Raymond Gottshall, a fired union employee. At the time of that hearing, Virgil Gardner, the division's Manager of Industrial Relations and EEO Coordinator, told Gottshall that "you should leave people out of this, especially people that aren't in the union because they will lose their job over it." Gottshall told Walden about Gardner's threat, but she nevertheless decided to testify. Wilmington Plant Manager Palmowski, also present at the hearing, testified that Gardner asked him "What the hell is she doing here?" Palmowski testified that "[h]e was very

9

upset. She was a non-union hourly employee at a union employee arbitration."

Second, the plaintiffs point to a July 11, 1991, memorandum from Gardner to Division Vice-President Vidan. In that memorandum, Gardner related the details of the EEOC charge filed by Phyllis Estepp. In thefinal paragraph, he recommended that the company seriously consider contracting out all of the security work. He wrote: "My personal terminology is that we used the Security Guard positions as a home for the sick, lame, and lazy. Their loyalties do not rest with the Company's best interests." The memorandum shows that copies were forwarded to Labor Relations Manager Hurd, Division Operations Manager Schutte, and Plant Manager Palmowski.

Third, the plaintiffs introduced evidence that, in late September or early October 1991, Georgia-Pacific received notice of the plaintiffs' August EEOC charge. Palmowski testified that Division Production Manager Watson telephoned him and "was upset" about the charge. Watson told Palmowski that "we can't have bullshit like this" and also that "we have to end this situation now. It's gone too far."

The plaintiffs' fourth piece of evidence stems from Palmowski's response to Watson's call. After the call, Palmowski confronted plaintiffs Walden and Poirier, informed them that Atlanta was upset, and urged them to consider withdrawing the EEOC charge because "the timing was absolutely poor." Palmowski testified that"I was being pressured to eliminate their jobs, and I didn't want to."

Finally, the plaintiffs point to evidence that the company's open door policy was "closed." The plaintiffs submit that the evidence shows that the company, and in particular James Hurd, failed to investigate their complaints contained in the letter to Division Senior Vice-President Donald Glass in accordance with the open door policy.

Georgia-Pacific contends that the forgoing evidence does not demonstrate sufficient retaliatory animus by persons actually connected to the decision to replace the plaintiffs

to constitute "direct evidence" under Price Waterhouse, and hence that the district court properly gave the jury a pretext charge. Moreover, Division Operations Manager Schutte testified that he alone made the decision to terminate the plaintiffs, based on Wilmington Interim Plant Manager Terry's recommendation. Plaintiffs' counsel acknowledged as much in his closing argument when he referred to Schutte as the "sole decisionmaker." As such, according to Georgia-Pacific, none of the evidence put forth by the plaintiffs directly reflects retaliatory animus on the part of those involved in the decision to fire the plaintiffs because there was no evidence at trial that Schutte or Terry made any statements or engaged in any conduct that reflected a retaliatory motive (nor do the plaintiffs' briefs point to any such evidence).

The plaintiffs rejoin that all of the above-mentioned Georgia-Pacific personnel were somehow involved in the decision to replace the plaintiffs. They contend that "[r]eality dictates that those who have direct access to the decisionmakers and are likely to influence their decision should be considered persons in the `decisionmaking process.' " Thus, even though Schutte testified that it was only he who made the decision to fire the plaintiffs, the plaintiffs urge us to take a broader view of who qualifies as a decisionmaker. They submit that, in determining the direct evidence question, we should consider statements and conduct of other Georgia-Pacific employees if those employees had access to or were likely to influence Schutte's decision. The plaintiffs in effect argue that the evidence shows that the entire chain of command was infected with retaliatory animus, and that we should assume that statements by other Georgia-Pacific managers influenced Schutte's decision.

We agree with the plaintiffs that the fact that they acknowledged that Schutte was the sole decisionmaker does not foreclose the Price Waterhouse determination. Indeed, there is much to support a conclusion that many Georgia-Pacific managers recommended and approved of replacing the plaintiffs with the outside guard service. Schutte testified that the idea to replace the guards was initially proposed by Wilmington Personnel Manager

11

Wunsch and Wilmington Plant Production Superintendent George Woodham in February or March 1991. And EEO Coordinator Gardner, in the July 1991 memorandum to Hurd, recommended replacing the guards with an outside security service. Nevertheless, that evidence cannot constitute direct evidence if it was not linked to Schutte's specific decision to fire the plaintiffs because we could not say that it directly reflects retaliatory animus on the part of the decisionmakers. See Hook, 28 F.3d at 374.

Taking each piece of evidence separately, we turn first to the comments that Gardner is alleged to have made at the Gottshall arbitration. That arbitration occurred in December 1990, long before the plaintiffs engaged in their first protected activity -- meeting with the EEOC investigator in May 1991. Hence, the statements were not only remote in time from the decision to fire the plaintiffs over a year later, but they cannot constitute direct evidence that the plaintiffs were replaced in retaliation for protected activity because they were made before that activity.

Second, as to Palmowski's warning to the plaintiffs that the company was upset about the EEOC charge, Palmowski was discharged several months before the plaintiffs were themselves fired, and therefore, could not have been involved in Schutte's termination decision, even though as plant manager he had the authority to fire the guards. Moreover, there is no evidence suggesting that Palmowski ever recommended that the plaintiffs be replaced. In fact, there is significant evidence that Palmowski worked to save the plaintiffs' jobs. The plaintiffs respond that Palmowski's statements reflected the retaliatory animus of the Georgia-Pacific managers who actually participated in the decision to fire them. But Palmowski's statement is vague and unconnected to any specific participant in the decision to replace the plaintiffs. As such, it could not constitute evidence that directly reflects retaliatory animus on the part of the decisionmakers.

Similarly, the evidence presented by the plaintiffs that the company, and in particular Labor Relations Manager Hurd, shut down the open door policy also is not sufficient to require a mixed motives charge. As the human resources director for the entire division, Hurd himself was not in the

direct chain of command over the plaintiffs, and there is no evidence that he was involved in the decision to replace the plaintiffs with the outside guard service in any way. Moreover, this evidence, even if probative of retaliatory motive, is circumstantial evidence that does not rise to the level of evidence that "directly" reflects retaliatory animus.

We turn next to Division Production Manager Watson's comments to Palmowski ("we can't have bullshit like this." and "we have to end this situation now. It's gone too far.") after he learned of the plaintiffs' EEOC charge. Watson was in the direct chain of command involved in the decision to fire the plaintiffs -- Schutte was his supervisor and he directly supervised the Wilmington plant manager (Palmowski and then Terry). Although he was in the direct chain of command, however, there is no evidence that he was involved in the decision to fire the plaintiffs, i.e. there is no evidence that he recommended the replacement of the plaintiffs or that he influenced Schutte's decision. His comments were also made several months before the plaintiffs were fired. Therefore, although Watson's comments are quite probative of retaliatory animus, it would be pure speculation to conclude that Schutte acted on the basis of Watson's advice. As Armbruster shows, statements even by decisionmakers cannot constitute direct evidence if there is no evidence somehow linking that person to the actual decision. Under such circumstances, we could not say that Watson's statements directly reflect retaliatory animus on the part of those involved in the decision.

We are left with Gardner's memorandum of July 1991 to Division Vice-President Vidan recommending that the guards be replaced, in which Gardner wrote that the plaintiffs' "loyalties do not rest with the Company's best interests." The memorandum shows that the decisionmaker, Schutte, was sent a copy of it. Despite the connection to Schutte, however, we conclude that the memorandum also does not constitute direct evidence. It was written more than six months before the plaintiffs were fired, and there is no evidence linking Gardner to the February 1992 decision to fire the plaintiffs. Even though Schutte presumably received a copy of the memo, the fact

13

that a decisionmaker received a memorandum containing a statement that allegedly reflects retaliatory animus does not show that the decisionmaker shared that retaliatory animus.

But even if the connection between Gardner's memorandum and Schutte's decision was closer, the statement in Gardner's memo does not constitute "direct evidence." Although probative of retaliatory animus, we find that the statement does not rise to the high level required of direct evidence, as it does not show that Georgia-Pacific acted unlawfully in firing the plaintiffs in February 1992. Gardner's statement that the plaintiffs' "loyalties do not rest with the Company's best interests" is vague and not specifically connected to any protected activity engaged in by the plaintiffs, i.e. speaking truthfully to the EEOC investigator in May 1991. In other words, the statement does not demonstrate that retaliation was more likely than not the motivating factor in the decision to replace the plaintiffs with the outside guard service, as our case law requires. See Griffiths, 988 F.2d at 470.

In sum, we conclude that the district court did not err in charging the jury with a pretext instruction because the plaintiffs did not produce sufficient "direct" evidence of retaliatory animus to require a mixed motives burden shifting charge.

III. Did the District Court Err in Excluding the Statements by Woodham and Fuller Allegedly Reflecting a Retaliation Animus?

The plaintiffs next contend that the district court erred in excluding from evidence, on relevancy grounds, statements allegedly made by George Woodham, the Wilmington plant Production Superintendent, and Robert Fuller, the Wilmington plant Warehouse Superintendent, to the plaintiffs. In September 1991, after the plaintiffsfiled their EEOC charge, Woodham allegedly said to Walden, in the presence of Poirier:

> [Y]ou should all be fired, you were disloyal to the company . . . . [I] should have fired all of[you] when [we] got rid of Estepp, she was a trouble maker too.

14

In August 1991, Fuller allegedly told the plaintiffs:

> if [I] was [your] boss [you] would all be fired. I'd bring the agency guards in here so fast your head would spin! You are disloyal to the company. They pay you, you should be loyal to them. You would all be fired, if I was your boss.

The district court's ruling to exclude the statements was made pre-trial at an in limine hearing, and the plaintiffs failed to make an offer of proof at trial. Given the applicable standard of review, we reject the plaintiffs' challenge.[6]

## A. Was the District Court's Exclusionary Pretrial Evidentiary Ruling Insufficiently Final that the Plaintiffs Waived Their Right to Appeal the Ruling by Failing to Make an Offer of Proof at Trial, So that We Review for Plain Error?

An in limine pretrial evidentiary hearing serves many useful purposes. See generally United States v. Downing, 753 F.2d 1224, 1241 (3d Cir. 1985); In re Paoli R.R. Yard PCB Litig., 916 F.2d 829, 859 (3d Cir. 1990) ("Paoli I"); Manual for Complex Litigation, Third S 21.642 (1985). When

_____

6. We also reject three of the plaintiffs' other evidentiary challenges. First, the district court did not err in excluding as irrelevant the statement from the "Thoughts for the Day" column of the company's 1984 EEO newsletter that "People who mind their own business will never be unemployed." The statement was written eight years before the plaintiffs lost their jobs, and was therefore too remote in time to be of probative value. Additionally, the statement is vague and does not clearly reflect a company policy of retaliating against "troublemakers," as the plaintiffs suggest.

Second, the plaintiffs contend that the district court erred in excluding evidence that the quality of the guard services provided by OSS was poor, which the plaintiffs submit was relevant to proving that the company's asserted reason for firing the plaintiffs--cost savings--was pretextual. We disagree. The evidence that OSS' performance was lacking does nothing to discredit the evidence that the company saved a significant amount of money by contracting out the security jobs. Finally, the district court did not abuse its discretion in excluding evidence that the company properly handled the open door policy complaints of two other employees.

15

a definitive evidentiary ruling is made pretrial, there is surely no point to taking the time at trial to make an objection if the in limine ruling admitted certain evidence, or to make an offer of proof if the in limine ruling excluded it. On the other hand, if the in limine ruling is only tentative, which is how the district court described its rulings here, then it is preferable that a definitive ruling be made in the context of a fuller (trial) record.

We are hard pressed to see the advantages of an in limine hearing that only produces tentative rulings. The game would hardly be worth the candle. But that is what we are faced with here, hence we deal with it. The key question is whether the in limine ruling excluding the Woodham and Fuller statements was sufficiently final that the plaintiffs' failure to make an offer of proof at trial operates to render the standard of review here abuse of discretion rather than plain error.

Although decisions to exclude evidence are generally reviewed for abuse of discretion, see, e.g., Barker v. Deere & Co., 60 F.3d 158, 161 (3d Cir. 1995), when a party fails to preserve the right to appeal an exclusion, we review for plain error. Under Fed. R. Evid. 103(a), a party may not appeal a ruling excluding evidence unless the party asserting error made an offer of proof at trial. 7 Georgia-Pacific points out that the district court expressly stated that its in limine rulings were "tentative," and contends that, by failing to attempt to introduce the Woodham and Fuller statements at trial, the plaintiffs waived their right to appeal the ruling under Rule 103 so that our review is subject to a plain error standard. The plaintiffs respond that the district court made comments at that hearing that suggested that the rulings were final, and thus, under

_____

7. Fed. R. Evid. 103(a) reads:

> Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . .

> (2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

these circumstances, their opposition to Georgia-Pacific's motion in limine was a sufficient offer of proof under Rule 103(a).

In American Home Assurance Co. v. Sunshine Supermarket, Inc., 753 F.2d 321 (3d Cir. 1985), we dealt with the question whether a party must formally object at trial to the admission of evidence in cases where the district court had previously denied that party's pre-trial motion to exclude that evidence. We rejected Sunshine's contention that American Home had waived its right to appeal the admission of the evidence when it failed to object at trial, reading Fed. R. Evid. 103(a) in conjunction with Fed. R. Civ. P. 46, which makes formal objections unnecessary.8 We reasoned:

> Here, counsel for American Home filed a written pretrial motion requesting that the evidence . . . be ruled inadmissible. The motion set forth reasons, including case citations, in support of the request. The trial court held a hearing at which it considered the arguments of counsel and made a definitive oral ruling with no suggestion that it would reconsider the matter at trial. Under these circumstances, requiring an objection when the evidence was introduced at trial would have been in the nature of a formal exception and, thus, unnecessary under Rule 46.

753 F.2d at 324-25; see also Government of the Virgin Islands v. Joseph, 964 F.2d 1380, 1384 (3d Cir. 1992); Bruno v. W.B. Saunders Co., 882 F.2d 760, 767-68 (3d Cir. 1989).

Therefore, if a party files an unsuccessful motion in

_____

8. Fed. R. Civ. P. 46 reads:

> Formal exceptions to rulings or orders of the court are unnecessary;
> but for all purposes for which an exception has heretofore been
> necessary it is sufficient that a party, at the time the ruling or order
> of the court is made or sought, makes known to the court the action
> which the party desires the court to take or the party's objection to
> the action of the court and the grounds therefor; and if a party has
> no opportunity to object to a ruling or order at the time it is made,
> the absence of an objection does not thereafter prejudice the party.

limine seeking the exclusion of certain evidence, that party need not formally object at trial when the evidence in question is introduced if two conditions are satisfied: (1) the party filed a written pre-trial motion setting forth reasons and case citations in support of the request that the evidence be excluded; and (2) the district court made a "definitive" ruling with no suggestion that it would reconsider the matter at trial.

American Home presented the obverse of the case at bar: American Home sought to have certain evidence excluded, and then failed to object to the introduction of that evidence. In contrast, the plaintiffs here opposed Georgia-Pacific's motion in limine to exclude certain evidence and then failed to make an offer of proof at trial. Despite this difference, we see no reason why the American Home rule should not apply to this case.9 In both instances, the same concern for efficiency motivates our decision to dispense with formal objections and offers of proof at trial following a final ruling on a motion in limine. As we explained in American Home, "if an issue is fully briefed and the trial court is able to make a definitive ruling, then the motion in limine provides a useful tool for eliminating unnecessary trial interruptions." American Home, 753 F.2d at 324.

These efficiency concerns are, of course, predicated on

_____

9. We acknowledge that it is generally easier for a party who seeks to exclude evidence to object at trial than it is for a party who seeks to admit evidence to make an offer of proof. As the First Circuit has observed, "To require that the evidence be offered again at trial would certainly give the trial court a second chance, but doing so can hardly be described as easy: on the contrary, the proponent would have to engage in the wasteful and inconvenient task of summoning witnesses or organizing demonstrative evidence that the proponent has already been told not to offer." Fusco v. General Motors Corp., 11 F.3d 259, 262 (1st Cir. 1993). We note however that a proffer in this case, at least of Woodham's statement, would not have been difficult. Woodham testified at trial and was the subject of extensive cross-examination. At all events,
despite the difficulties that may be involved in proffers of evidence in some cases, we find that the benefits, described infra at n. 10, outweigh any burdens that such proffers might place on the proponents of evidence when the district court has made only a tentative pretrial ruling.

18

the district court's actually making a final decision before trial. If the district court makes only a tentative ruling on a motion in limine an objection or offer of proof at trial is not unnecessary or "formal." Rather, there are separate interests, noted in the margin, that are promoted by requiring the unsuccessful party to make an objection or offer of proof at trial.10

_____

10. First, motions in limine often present issues for which final decision is best reserved for a specific trial situation. American Home, 753 F.2d at 324; cf. Luce v. United States, 469 U.S. 38, 41-42 (1984) (holding that criminal defendant must testify to preserve claim of improper impeachment with prior conviction) ("The [in limine] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer. Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). This is particularly true when the evidence is challenged as irrelevant or prejudicial; the considerations weighed by the court will likely change as the trial progresses. See Rosenfeld v. Basquiat, 78 F.3d 84, 91 (2d Cir. 1996) ("Unlike rulings that involve balancing potential prejudice against probative value, the ruling in the present case was not fact-bound and no real purpose other than form would have been served by a later objection.").

We have also made clear that rulings excluding evidence on Rule 403 grounds should rarely be made in limine. "[A] court cannot fairly ascertain the potential relevance of evidence for Rule 403 purposes until it has a full record relevant to the putatively objectionable evidence. We believe that Rule 403 is a trial-oriented rule. Precipitous Rule 403 determinations, before the challenging party has had an opportunity to develop the record, are therefore unfair and improper." Paoli I, 916 F.2d at 859; see also In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 747 (3d Cir. 1994) ("Paoli II"). Under these and similar circumstances, if a district court makes a tentative pre-trial ruling, it has the opportunity to "reconsider [its] in limine ruling with the benefit of having been witness to the unfolding events at trial." United States v. Graves, 5 F.3d 1546, 1552 (5th Cir. 1993).

Second, requiring an objection or offer of proof at trial when a district court has made only a tentative ruling permits the appellate court to undertake a more meaningful review of the evidentiary ruling at issue. Appellate review of a tentative ruling based only on a hypothetical pretrial offer of proof is much more difficult than when that offer of proof is made in a concrete factual context at trial. As the First Circuit has observed in a case in which there was no trial objection, "it is precisely

19

Thus, a party who unsuccessfully opposes an in limine motion to exclude certain evidence can appeal that ruling without an offer of proof at trial if the district court was fully informed and made a pretrial ruling with no suggestion that it would reconsider that ruling at trial. Concomitantly, where a district court makes a tentative in limine ruling excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial.

The critical question before us, then, is whether the district court's in limine ruling to exclude the Woodham and Fuller statements was "a definitive . . . ruling with no suggestion that it would reconsider the matter at trial." American Home, 753 F.2d at 325.11 Georgia-Pacific submits that the plaintiffs cannot make this showing because the district court expressly stated at the opening of the hearing that its rulings were tentative:

> I want to be helpful, and maybe I'm not going to be helpful. I'm going to make some tentative rulings on what I read in the briefing, and then we will go from there, and to have some refinement. I want this trial to go as smoothly with the jury as possible. I will make these tentative rulings with what I have in the briefing, and then we will see where we are as we begin with the different aspects of the case.

In response, the plaintiffs point to a colloquy that occurred after the court made all of its rulings. When the plaintiffs' counsel challenged the court's ruling excluding a statement in the company's 1984 EEO newsletter, the court responded:

_____

because appellant comes before us not having attempted to offer evidence during the trial that we cannot rule intelligently on the underlying evidentiary questions; he presents us with an abstract intellectual exercise, rife with conjecture, rather than affording us an opportunity to inspect concrete evidence, offered and excluded in an actual trial context." United States v. Holmquist, 36 F.3d 154, 164 (1st Cir. 1994), cert. denied, 514 U.S. 1084 (1995).

11. Georgia-Pacific does not dispute that the parties' pretrial papers satisfactorily briefed the district court on the evidentiary issues.

THE COURT: Let me just tell you something, Mr. Kuroishi, so we can get along real well. You are going to have to accept the rulings of the Court and get along. I'm trying to tailor my rulings to the relevant issues in this case. You folks are all over the board.

You have a claim of retaliation as properly alleged and you have three plaintiffs. I am trying to get evidence that relates to the, and things that might otherwise indicate a corporate animus. You are going to lose some and you are going to win some. If I'm wrong, you will get me reversed. If I'm right, I will get affirmed. I'm not concerned about that. I'm trying to make rulings in time and germane to the issue we're trying. Don't reargue each one. We will be here much longer than is appropriate for this kind of a case.

MR. KUROISHI: Your Honor, the only concern I have is many times on appeal the Third Circuit will say, You didn't say anything at the time.

THE COURT: All they have to do is look at your brief, and you have every case in there. You analyze, reanalyze cases. I have tried to address them in terms of rulings in the context of the facts of this case. You have all those papers in the record. You don't have to reargue them with me.

Of course, when an objection is granted or overruled, there is no exception any more in the Federal System, so it's on the record. We want to get to the facts of this case.

We are sympathetic to the plaintiffs' argument that, based on this colloquy, counsel believed that the district court's rulings, despite the court's initial description of them as tentative, were in fact final. Several aspects of the court's admonition to plaintiffs' counsel suggest that the plaintiffs could obtain relief from the rulings only through appellate review. Moreover, the court's comments may have suggested that plaintiffs' counsel had already preserved his objections for appeal.

Nevertheless, under American Home, a party is only excused from an offer of proof at trial if the district court's

21

in limine ruling was definitive with no suggestion that the court would reconsider the ruling. The district court clearly stated at the outset of the hearing that its rulings were tentative and that it would reconsider those rulings at trial, and the court never retreated from that position. Although the district court told plaintiffs' counsel not to reargue every ruling, it did not countermand its clear opening statement that all of its rulings were tentative, and counsel never requested clarification, as he might have done. Moreover, and tellingly, plaintiffs' counsel attempted to introduce at trial other evidence that was excluded at the in limine hearing, which suggests that he understood the court's protocols.12

Finally, we note that the court's admonition, which forms the basis of plaintiffs' requested reprieve, was made after the court ruled on the Woodham and Fuller statements, and addressed only the decision to exclude the 1984 EEO newsletter. This undermines plaintiffs' blanket contention. Additionally, it is clear to us that plaintiffs' able and resolute counsel was never cowed by his colloquy with the district court. We hold that under these circumstances, an offer of proof at trial would not have been merely "formal" and that the plaintiffs were required to make one. As they failed to do so, we will review the district court's decision to exclude the Woodham and Fuller statements only for plain error.

B. Did the District Court Plainly Err in Excluding the Statements?

The basis for our review of the statements at issue is Fed. R. Evid. 103(d), which permits us to take notice of "plain errors affecting substantial rights." The Advisory Committee notes to Rule 103(d) indicate that the wording of the rule is taken from Rule 52(b) of the Federal Rules of Criminal Procedure. Accordingly, we have taken guidance on our

_____

12. More specifically, while at the in limine hearing, the court excluded employee petitions complaining of the poor quality of the OSS guards under Rule 401, at trial, during Walden's testimony, plaintiffs' counsel attempted to inquire about the poor performance of those guards. An objection was made and sustained.

22

construction of the civil plain error standard from the Supreme Court's interpretation of the criminal standard. Fashauer v. New Jersey Transit Rail Operations, Inc., 57 F.3d 1269, 1289 (3d Cir. 1995).

In United States v. Olano, 507 U.S. 725, 732–34 (1993), the Court set forth three requirements for a plain error challenge to succeed. First, there must be an actual error -- a deviation from or violation of a legal rule. Second, the error must be plain; that is, the error must be clear and obvious under current law. Finally, the error must affect substantial rights. In other words, the error must be prejudicial and must have affected the outcome of the district court proceedings. See also Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure S 5043 (1996)(error must produce "substantial injustice" denying the appellant a fair trial).

It has been our practice to exercise our power to reverse for plain error sparingly. Chemical Lehman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 89 F.3d 976, 994 (3d Cir.), cert. denied, ___ U.S. ___, 117 S.Ct. 485, 136 L.Ed.2d 379(1996). A finding of plain error is only appropriate in the civil context when the error is so serious and flagrant that it goes to the very integrity of the trial. Fashauer, 57 F.3d at 1289 (citing United States v. Carson, 52 F.3d 1173, 1188 (2d Cir. 1995), cert. denied ___ U.S. ___, 116 S.Ct. 934, 133 L.Ed.2d 861 (1996)). It is this high standard which we will apply to the plaintiffs' claim.

The question before us is whether it was plain error for the District Court to exclude the Woodham and Fuller statements.13 That is, was it error to exclude statements for the reason that they were made by individuals "outside the

_____

13. The plaintiffs contend that if the district court had properly admitted
these statements, they would have constituted sufficient direct evidence of retaliation to require a mixed motives charge. But, like the statements we discussed in section II supra, these statements do not directly reflect retaliatory animus on the part of persons connected to the decision to fire the plaintiffs. There is no evidence linking Fuller to that decision. And although Woodham recommended replacing the guards, he made that recommendation months before the plaintiffsfirst engaged in any protected activity.

23

chain of decision-makers who had the authority to hire and fire" the plaintiffs, Gomez v. Allegheny Health Serv., Inc., 71 F.3d 1079, 1085 (3d Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996), when those statements constituted evidence of an atmosphere of retaliatory animus?

Our cases distinguish between discriminatory comments made by individuals within and those by individuals outside the chain of decisionmakers who have the authority to discharge. We have generally held that comments by those individuals outside of the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination. See id. at 1085; see also Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 546 (3d Cir. 1992)(arguing that to allow a series of stray remarks over a five year period to suffice to prove discriminatory motive would be to overstep the limits of Title VII).

The statements made by Woodham and Fuller in the present case fall within the category of stray remarks by non-decisionmakers. Although both worked at the Wilmington plant in a supervisory capacity, neither supervised the plaintiffs. Furthermore, neither Woodham or Fuller participated in the decision to discharge the plaintiffs, nor did they have the authority to order the plaintiffs' termination. Finally, it is also worthy of note that the statements at issue were somewhat remote in time from the decision to fire the plaintiffs (the statements occurred in August 1991, and the plaintiffs were terminated in February 1992) and, in fact, Woodham was transferred from the Wilmington facility months before the termination decision.

Although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out, and therefore can be relevant to the question of retaliation. See Woodson, 109 F.3d at 922; Antol v. Perry, 82 F.3d 1291, 1302 (3d Cir. 1996). Such evidence "may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an

24

unlawful motive." Antol, 82 F.3d at 1302 (quoting Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988)); see also Ezold, 983 F.2d at 546 (evidence of discriminatory atmosphere may be relevant because it tends "to add `color' to the employer's decisionmaking processes and to the influences behind the actions taken with respect to the individual plaintiff "). Accordingly, stray remarks by non-decisionmakers may be properly used by litigants as circumstantial evidence of discrimination. Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995).

Although stray remarks by non-decisionmakers may be relevant to proving retaliation, we have never held that such remarks are at all times admissible. Rather, the district court retains its normal discretion to exclude such evidence under general relevancy principles. See Fed. R. Evid. 401. Of course, the district court must also keep in mind the import of our prior case law, noted supra, that stray remarks are not categorically excludable even though not directly connected to the particular employment decision at issue.

In the present case, the district court apparently made just such a blanket exclusion of the Woodham and Fuller statements. The court found the statements to be"general and unrelated" to the issue of retaliation, which the court considered to be the "specific issue" of the case. Although it is unclear from the record, this finding was presumably based on the fact that Woodham and Fuller never directly supervised the plaintiffs, and the fact that Woodham was transferred from the Wilmington plant months before the plaintiffs were fired. Because it is clear, however, that stray remarks by non-decisionmakers may be relevant to the question whether the plaintiffs were fired in retaliation for protected activity, these facts in and of themselves are not sufficient to deem the Woodham and Fuller statements irrelevant. It is apparent that the district court erred in its categorical exclusion of the Woodham and Fuller statements.

Our analysis does not end here, however. As noted, supra, to satisfy the plain error standard, the error not only must be clear and obvious under current law, but also must affect a substantial right. To reiterate, this means

25

that the error must have affected the outcome of the trial proceedings in a manner that threatens "substantial injustice." The court's error in excluding the Woodham and Fuller statements does not reach this threshold.

Although the stray remarks at issue could have provided additional circumstantial evidence of the defendant's discriminatory animus, the jury was presented with other significant evidence of the defendant's possible bias against "troublemakers" (i.e. those workers who engage in legally protected activities to enforce their rights) in its organization, and yet still found for Georgia-Pacific. This evidence included statements reflecting a similar animus by Palmowski and Watson, both of whom were in the plaintiffs' chain of command, as well as additional statements by Virgil Gardner, the company's EEO coordinator.[14] The plaintiffs introduced, for example, Gardner's memorandum labeling the plaintiffs as "sick, lame and lazy. . . [whose] loyalties do not rest with the company's best interests." Additionally, Gardner's statements designed to deter plaintiff Walden from being a witness at Gottshall's union arbitration hearing were placed before the jury.

On this record, we cannot conclude that the outcome of the trial would have been different had the jury heard the Woodham and Fuller statements, nor can we conclude that the error threatened the very integrity of the trial. Accordingly, we hold that the district court's exclusion of the Woodham and Fuller statements did not amount to plain error.

IV. Impeachment of a Corporate Employee with a Conviction of the Corporation under Rule 609

The plaintiffs next contend that the district court erred in excluding evidence of Georgia-Pacific's 1991 plea of guilty to tax evasion charges based on a fraudulent appraisal of

_____

14. Palmowski testified, for example, that upon hearing of the plaintiffs' EEOC charges, Watson told him "we have to end this situation now. It's gone too far." In addition, the jury heard that Palmowski admitted to Phyllis Estepp that she had been laid off because of the EEOC charge filed by her predecessor, John Crothers.

26

land in Florida in 1984. The plaintiffs sought to introduce this evidence under Fed. R. Evid. 609 to impeach the testimony of individual Georgia-Pacific employee witnesses, none of whom were shown to have any connection to the acts underlying the corporate conviction. The district court excluded the evidence under Fed. R. Evid. 403, finding that introduction of the evidence would be unduly prejudicial. The plaintiffs contend on appeal that use of this conviction falls under the "automatic" admission provision of Fed. R. Evid. 609(a)(2), and is therefore not subject to a Rule 403 analysis. Our review of the exclusion is plenary, as the construction of Rule 609 is an issue of law. See United States v. Pelullo, 964 F.2d 193, 199 (3d Cir. 1992).

Fed. R. Evid. 609, as amended in 1990, provides in relevant part:

> (a) General Rule. For the purpose of attacking the credibility of a witness,
>
> (1) evidence that a witness other than the accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted . . . ; and
>
> (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

Thus, if the prior conviction involved dishonesty or false statements, the conviction is automatically admissible insofar as the district court is without discretion to weigh the prejudicial effect of the proffered evidence against its probative value. See Cree v. Hatcher, 969 F.2d 34, 37 (3d Cir. 1992); United States v. Wong, 703 F.2d 65, 68 (3d Cir. 1983). Because Rule 609(a)(2) does not permit the district court to engage in balancing, we have held that Rule 609(a)(2) must be construed narrowly to apply only to those crimes that bear on a witness' propensity to testify truthfully. See Cree, 969 F.2d at 37.

We assume arguendo that Georgia-Pacific's conviction for tax evasion falls within the ambit of 609(a)(2). The real question before us is whether prior convictions of a

corporation are admissible under Rule 609 generally to impeach the testimony of individual employee witnesses without any evidence that those witnesses participated in the conduct underlying the conviction. This is a question of first impression in this circuit, and so we write on tabula rasa.

Rule 609 is premised on "the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath." Cummings v. Malone, 995 F.2d 817, 826 (8th Cir. 1993) (citing Campbell v. Greer, 831 F.2d 700, 707 (7th Cir. 1987)). Rule 609 evidence is admitted in order to inform the jury about the character of the witnesses whose testimony the jury is asked to believe. See United States v. Martinez, 555 F.2d 1273, 1275 (5th Cir. 1977). The automatic admission provision of Rule 609(a)(2) expresses the idea that some individuals who are found to have been dishonest in other contexts are presumed to be more prone to perjury than others. See Conf. Rep. No. 1597, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 7051, 7098, 7103.

We have held that admissibility under Rule 609(a)(2) turns on whether the evidence of the crime bears on the witness's "propensity for falsehood, deceit, or deception." Cree, 969 F.2d at 38. It is only the testifying witness' own convictions that will bear directly on the likelihood that he or she will testify truthfully. See United States v. Hayes, 553 F.2d 824, 827 (2d Cir. 1977). Accordingly, it is axiomatic that it is only the testifying witness' own prior convictions that should be admissible on cross-examination to impeach his credibility. See United States v. Austin, 786 F.2d 986, 992 (10th Cir. 1986). Thus, for the plaintiffs' position to be correct, the 1991 Georgia-Pacific conviction must be the individual employee's "own" in some meaningful fashion.

We believe that this cannot be the case. Criminal acts are relevant to a witness' credibility only if that witness actually participated in the criminal conduct.15  It strains logic to

_____

15. The plaintiffs contend in their reply brief that the Supreme Court's pre-Rules decision in United States v. Trenton Potteries Co., 273 U.S. 392

argue that an employee's credibility is properly brought into question by the mere fact that he or she is presently employed by a corporation that in some unrelated manner was guilty of dishonest acts, no matter how egregious those acts may have been. There is no evidence that the individual witnesses who testified at trial had any involvement with Georgia-Pacific's tax evasion scheme, and thus that scheme could not possibly bear on the likelihood that those witnesses would testify truthfully.16

_____

(1927), stands for the proposition that corporate convictions are admissible to demonstrate the bias of the employee witness. They cite the Court's holding that a corporate employee could be cross-examined on prior corporate convictions if admissibility of the evidence was "urged on the ground that it was directed to the bias of the witness, or that it was preliminary to showing his implication in the supposed offense, and thus affecting his credibility." Id. at 404-05 (internal citations omitted).

Aside from the fact that this case was decided decades before Rule 609 was enacted, we believe that Trenton Potteries stands squarely for the proposition that the witness must be implicated in the corporate conviction in order for evidence of the conviction to be proper impeachment material. This is clear from the Court's language; the corporate conviction is relevant if it is "preliminary" to demonstrating the witness' own implication in the offense. While Trenton Potteries also suggests that the corporate conviction could be used to demonstrate that the witness is biased, such a bias inquiry is irrelevant to our consideration under Rule 609(a)(2). That is, the question presently at issue is whether the corporate conviction bears on the individual witness's propensity to commit perjury as a convicted felon, not whether the existence of the conviction somehow would bias the individual employee witness toward the corporation.

16. The only reported decision since the adoption of the Federal Rules of Evidence to address this question, CGM Contractors, Inc. v. Contractors Environmental Services, Inc., 383 S.E.2d 861 (W. Va. 1989), arose under the West Virginia Rules of Evidence. Based on those rules (which are identical to the federal rules in pertinent part), the West Virginia Supreme Court of Appeals held that a corporate conviction is admissible against a witness only if the witness "held a managerial position at the time the crime occurred such that it may be fairly inferred that he shared responsibility for the criminal act, or have actually participated in the criminal act." 383 S.E.2d 866. Although we need not announce a similar rule to resolve the present case, our reasoning and that of the West Virginia court are consistent, and we believe that the ratio decidendi of the West Virginia court is sensible in light of the policies upon which Rule 609 is based.

Plaintiffs contend that the mandatory nature of Rule 609(a)(2) precludes the district court from exercising any discretion over the admissibility of the Georgia-Pacific convictions. While the plaintiffs are correct that the district court would be precluded from exercising its Rule 403 balancing discretion if the evidence was properly within Rule 609(a)(2), the district court is not precluded from determining whether the prior corporate conviction falls within the ambit of Rule 609 at all. Only if the witness is directly connected to a prior conviction for a crime involving dishonesty or a false statement does Rule 609(a)(2)'s automatic admission provision apply. To allow Rule 609(a)(2) to apply otherwise would be to "override the fundamental purpose of impeachment evidence, namely, to expose a defect in the witness's credibility." Glen Weissenberger, Federal Rules of Evidence 285-86 (1995).

In sum, we find that Rule 609 does not permit corporate convictions to be used to impeach the credibility of employee witnesses who were not directly connected to the underlying criminal act. Since there was no evidence of such a connection in the present case, the district court properly excluded the Georgia-Pacific convictions as improper impeachment evidence.

The order of the district court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit